594 So.2d 372 (1991)
STATE of Louisiana
v.
George BROWN.
No. KA 88-1266-R.
Court of Appeal of Louisiana, First Circuit.
September 23, 1991.
*373 Bryan Bush, Dist. Atty. by Sue Bernie, Asst. Dist. Atty., Baton Rouge, for plaintiff-appellee.
Office of the Public Defender by Kathleen Richey, Asst. Public Defender, Baton Rouge, for defendant-appellant.
Before SAVOIE, CRAIN and FOIL, JJ.
CRAIN, Judge.
George Bernard "Benny" Brown (defendant) was indicted by the East Baton Rouge Parish Grand Jury for the second degree murder of Sheri Lynn Daigle, a violation of LSA-R.S. 14:30.1. Defendant entered a plea of not guilty; and, at trial, the jury found defendant guilty as charged. Subsequently, the trial court sentenced defendant to the mandatory term of life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence. Defendant appealed, urging thirteen assignments of error, but noting in his original brief, his abandonment of assignments of error numbers four, five, seven, eight and twelve.
In finding reversible error in assignment of error number eleven, we pretermitted review of defendant's other briefed assignments of error, reversed defendant's conviction and sentence, and remanded this case to the trial court for further proceedings. State v. Brown, 549 So.2d 323 (La. App. 1st Cir.1989). The state's application for supervisory writs was granted, State v. Brown, 558 So.2d 556 (La.1990); and in State v. Brown, 562 So.2d 868 (La.1990), in a five to two decision, the Louisiana Supreme Court reversed our decision, reinstated defendant's conviction and sentence, and remanded the case to us for consideration of defendant's assignments of error pretermitted on the original appeal. Our *374 consideration of the pretermitted assignments follows.
The record reveals that, during the early afternoon of May 7, 1987, Brett Fontenot came to the residence of Randall Johnson in Baton Rouge. Fontenot informed Johnson of his intention to "take a ride" and look for redwood that would be used to build kitchen cabinets. Johnson agreed to assist Fontenot in his efforts to locate redwood in return for Fontenot's agreement to assist Johnson in building some cabinets for Johnson.
They then proceeded to ride around in Fontenot's pickup truck looking at various locations. At about 5:30 p.m. that afternoon, they drove to a "boarded up" house at 10443 Siegen Lane, still seeking redwood. Although Johnson had not been there before, Fontenot was familiar with the location, having once known an individual who lived there. Fontenot and Johnson exited the truck, walked around the house and stepped onto the back porch of the house. The area behind the house was overgrown with vegetation. When they turned around and looked into the area behind the house, they observed a "fresh trail" leading away from the house and into the overgrown area. Johnson and Fontenot became curious and began walking down the trail which was not "very long." In the middle of the trail, they observed a small pool of blood. Surmising that an animal might have been wounded, they began looking for something.
The trail led directly to three concrete culverts (septic tanks). After looking around, Fontenot returned to where Johnson was standing and asked him if he had taken the top off one of the culverts. Johnson replied in the negative, and Fontenot then removed the lid from the middle septic tank and observed two shoes protruding from the water inside the septic tank.
Johnson and Fontenot then went to the St. George Fire Station and telephoned the police. In response to the call, Randy Walker, who was then a deputy sheriff of the East Baton Rouge Parish Sheriff's Office, met with and spoke to Johnson and Fontenot at the fire station before proceeding with them to 10443 Siegen Lane. There, Johnson and Fontenot took Walker to the rear of the house and down the path to the three round concrete septic tanks, which Walker estimated were about two to three feet in diameter. Inside one of the tanks, Walker saw moccasins "sticking out;" and he confirmed that a body had been found.
Walker then notified other law enforcement personnel. The record reveals that numerous agents of various law enforcement agencies responded to the notification. With the assistance of the next officer who arrived at the location, Walker cordoned off the scene with evidence tape to preserve the scene. In doing so, they cordoned off separately a tire track Walker had found in the driveway leading to the house. The tire track, which appeared to be that of a car, was by Walker's estimation about forty to forty-five yards from the front of the house.
East Baton Rouge Parish Deputy Coroner Chuck Smith and Lt. Randy Keller of the East Baton Rouge Parish Sheriff's Office came to the scene. At about 7:00 p.m., they pulled the body (which was subsequently determined to be that of Sheri Lynn Daigle) from the middle septic tank in which it had been discovered. They then carried the body to the rear of the house, where it was photographed soon thereafter.
Deputy Coroner Smith testified that the body was in full rigor mortis. He also testified that the water inside the septic tank was about 70°.
The body was clad in blue jeans and a red tank top, and there were leather moccasins on the victim's feet. Smith and Keller did not unzip the victim's blue jeans. However, the victim's blue jeans were found unzipped and pulled down to "hip level." Keller examined the victim's pants pockets and found a quarter and two pieces of paper (one white and one yellow) in her left front pocket. The number 344-2760, an apparent telephone number, was written on the yellow piece of paper; and, on the *375 white paper, there was a mirror image of the number.
The record reflects that investigating law enforcement officers determined that the distance from Siegen Lane to the front of the house where the body was found was about six hundred and forty-two feet. Several of the law enforcement agents who went to the location on the day the body was discovered described the overgrown area located behind the house, the path through the area leading to and ending at the septic tank and the pool of blood found in the path.
Deputy Coroner Chuck Smith testified that the weeds behind the house were at least waist high, with some taller. Charles Hughes, Jr.[1] described the overgrown area behind the house as consisting of bushes about five to six feet high. East Baton Rouge Parish Deputy Sheriff Carson Bueto testified that the weeds were "almost as thick as straw on a broom" and as tall as "his head." East Baton Rouge Parish Sheriff's Detective Don Strickland described the growth at the rear of the house as very thick growth, about five to five and one-half feet tall.
Lt. Randy Keller and Detective Don Strickland estimated that the pathway through the overgrown area was about eighteen inches wide. Deputy Coroner Chuck Smith testified that the weeds in the pathway had been freshly knocked down or trampled within probably a twenty-four hour period, and Lt. Keller testified that the weeds or grass "had laid over where something had either walked or been drug or gone through there." Deputy Coroner Smith described the pool of blood in the pathway as being about twelve inches in diameter, uncoagulated and saturated more in the middle than on its outer edges, i.e., concentrated more in the middle. Law enforcement agents described the ground at the scene as "kind of damp," and "pretty soggy."
At about 1:00 p.m. on May 8, the day after the victim's body was found, Dr. Alfredo Suarez performed an autopsy on the body. At trial, Dr. Suarez was qualified by stipulation of counsel and accepted by the trial court as an expert in the field of forensic pathology.
Dr. Suarez estimated that the victim was 5' 4" tall and weighed one hundred and ten pounds. Dr. Suarez testified that his external examination revealed that the victim had sustained multiple injuries to the head. He found post-mortem and pre-mortem injuries, with the pre-mortem injuries being predominately to the head. Dr. Suarez stated that he determined the cause of the victim's death had been inhalation of some of the contents of the septic tank in which the body had been placed. However, in any event, multiple skull fractures and bleeding in the cerebrum were sufficient to have caused death. Dr. Suarez testified that the head injuries, eight lacerations to the top of the head, were "semi-lunar shape, sort of semi-circular, not a complete circle but sort of a semi-lunar shape" and that they were inflicted by a single instrument. Dr. Suarez also described a rectangular area of discoloration to the victim's neck which he determined was probably a post-mortem injury. On the other hand, there was an injury to the victim's chin, consisting of a laceration and many contusions, which the doctor stated could have been caused by the victim being struck by a fist or something more blunt than the instrumentality used to inflict the head injuries. However, Dr. Suarez further stated that the injury to the victim's chin could have been caused by the placement of the victim head first into the septic tank. According to Dr. Suarez, the head injuries were probably inflicted by some kind of metallic object having some kind of an edge and with sufficient force to drive the skull into the brain. There was cerebral matter on the victim's outer scalp. According to Dr. Suarez's findings, the victim was in a still position when hit several times based on the absence of contrecoup, i.e., the absence of damage to the brain on the side of *376 the brain opposite where the victim's head was hit with an instrument. Dr. Suarez testified that there was plenty of blood inside the victim's body and that she was probably beaten only moments before being placed in the septic tank.
Dr. Suarez testified that, at the time of the autopsy, the victim's body was flaccid. He explained that the body becomes flaccid after first being rigid. Rigor mortis means rigidity after death. Rigor mortis generally develops within two to three hours after death and lasts about thirty to forty-eight hours. However, many factors can accelerate or slow down rigor mortis. Those factors include temperature and amount of musculature of a body. Hence, Dr. Suarez stated that placing a body in a cool underground tank containing cool water would slow down the development of rigor mortis.
Based upon photographs of the victim's body taken shortly after the body was removed from the septic tank and the degree of rigidity of the body depicted in the photographs, Dr. Suarez testified that the victim had been dead between six and twenty-four hours prior to being found (at approximately 7:00 p.m. on May 7) or between twenty-four and forty-eight hours of the time he saw the body on May 8. Dr. Suarez stated that there was nothing inconsistent between the rigor and the fact that the body had been submerged underground and the body having been dead for twenty-four hours. Dr. Suarez stated that, as a matter of fact, the rigor and the submergence of the body underground were probably more consistent with the victim having died twenty-four hours before the body was found. However, Dr. Suarez stated that he could not rule out the hypothesis that the victim died (as late as) 1:00 p.m. Thursday (May 7).
Dr. Suarez gave testimony relative to the coagulation of blood outside the body. In that regard, Dr. Suarez testified that humidity and moisture would probably give blood (viewed with the naked eye) the appearance of being fresh.
Dr. Suarez collected the victim's stomach contents. The contents consisted of only about forty c.c.'s of a brownish fluid resembling a "coffee-like material." Based thereon, Dr. Suarez concluded the victim had had something to drink within about thirty minutes of her death.
The record reveals that on May 7, after the police found the yellow paper with the telephone number on it inside the victim's pocket, they determined the number was that of Ray (L.J.) Doucet. That evening, Lt. Randy Keller and Sgts. Don Strickland and Debbie Yarborough went to the area of Baton Rouge commonly known as Spanish Town. There, they talked to L.J. Doucet, who resided at 907 North Seventh Street in the Prescott Place Apartment Complex where he worked as manager. The officers also spoke to East Baton Rouge Parish Deputy Sheriff Derrick M. Foxx, who lived in the apartment complex and worked in a security capacity for the complex. Doucet and Foxx were taken to a funeral home where they identified the victim's body.
Joseph Beatty testified that he met the victim in late January or early February of 1987. They lived together and were doing so until Tuesday, May 5, 1987. At that time, the victim moved out of the Prescott Place Apartment in which she and Beatty lived.
Michael S. Hood testified that in May of 1987 he lived in an apartment at 609 Spanish Town Road. He had lived there for approximately one week following his release from parish prison for a DWI conviction. Jacqueline Haydel lived in an apartment across the hall from him. Hood stated that he had met the victim on approximately May 1 through Haydel, that he and the victim had spent the night together on May 3 and 4 and that he and the victim had had sex on Tuesday night, May 5. During mid-morning on May 5, the victim had brought some or all of her belongings to his apartment.
On Wednesday, May 6, Dorothy Alice Forbes (a girlfriend of Hood) came to Baton Rouge from Missouri to reside with Hood at his Spanish Town residence. She arrived there at about 3:00 p.m. The victim was inside Hood's apartment when Forbes arrived. The victim went outside and *377 Forbes met her downstairs, where the victim was putting on her shoes. Hood testified that his intent was to ask Forbes if the victim could stay with them until she found a place to live.
Following Forbes' arrival on May 6, Hood planned to have a barbecue for the victim, himself, Forbes and Haydel. Hood testified that they were going to use the victim's hibachi to barbecue. Hood stated that he and the victim had not eaten at all that day and that the victim was going to get her hibachi that afternoon.
Kimberly Cagle testified that in May of 1987 she lived in Spanish Town. She knew defendant. They lived in the same apartment complex, and defendant was her next door neighbor. Cagle stated that, at about 5:00 p.m. on May 6, she spoke to defendant. Defendant said that he "needed to have a woman." Cagle asked defendant if he had a girlfriend, and defendant replied that he and his girlfriend had "broken up." According to Cagle, defendant seemed "a little restless" that afternoon. About an hour to an hour and one-half later, Cagle saw defendant talking to a blond girl and observed them walk toward defendant's apartment. Although she initially testified that she subsequently learned that the girl was Sheri Daigle, Cagle stated in later testimony that (although she was not sure the girl was the victim) the girl could have been "the victim."
Michael Hood's testimony revealed that, on May 5, at approximately 6:30 or 7:00 p.m., he observed defendant and the victim on the sidewalk talking to each other. Hood could not hear their conversation. However, Hood testified that the victim disclosed the subject matter of the conversation to him, i.e., that "[defendant] wanted to have sex with her, and she didn't want anything to do with [defendant]."
Michael Hood further testified that, at about 5:00-5:30 p.m. on May 6, he saw defendant standing at the bottom of the stairs to his apartment talking to the victim. Hood asked the victim if she was going to get her hibachi for the barbecue. The victim replied in the affirmative. Hood stated that he did not see the victim leave to go get the hibachi. Hood never again saw the victim, and he did not again see defendant that night.
Jacqueline Haydel testified that she saw the victim on the afternoon of May 6, when the two met on the way to the Capital Grocery Store. Haydel stated that she last saw the victim that evening between approximately 3:30-4:00 p.m. and 5:30-6:00 p.m. While she and the victim were talking to each other, defendant came up, and Haydel then went upstairs.
The testimony of Deputy Sheriff Derrick M. Foxx reveals that, between 5:30 and 6:30 p.m. on May 6, he saw the victim at the Prescott Place Apartments. She was coming down the stairwell to get into a parked car occupied by defendant. Defendant told Foxx he was waiting for the victim. Foxx identified the car as the car depicted in S-65 and S-66 (photographs of defendant's 1974 bronze Mercury Montego) introduced into evidence by the state. The victim was carrying a hibachi and got into defendant's car with the hibachi. Defendant was driving the car. The victim was wearing blue jeans and a "tank type halter top." Foxx never again saw the victim alive.
Vince Fender, a friend of the victim, lived in the Prescott Place Apartments in May of 1987. He testified that, while visiting with Cheryl Robin Holt on the evening of May 6, he saw the victim riding inside the car depicted in S-65 and S-66. Defendant was driving the car, which was traveling on Sixth Street in the direction opposite defendant's apartment. Fender never again saw the victim.
Cheryl Robin Holt knew both defendant and the victim. She identified S-65 and S-66 as depicting defendant's car. Holt stated that, on May 6 at about 6:45 p.m., she saw the victim in defendant's car, which defendant was driving on Sixth Street toward the Capital Lakes Park area. She never again saw the victim, and she did not observe defendant drive back at any time.
The record reveals that, after Lt. Randy Keller and Sgts. Don Strickland and Debbie Yarborough contacted L.J. Doucet and Deputy Sheriff Derrick M. Foxx, they continued *378 their investigation by interviewing other individuals, including Paul Beatty, Michael Hood and Jacqueline Haydel.
Based upon the information they had accumulated, the officers attempted to locate and talk to defendant during the early pre-dawn hours of May 8. In that regard, they went to defendant's apartment at 555 Spanish Town, number six. There, they spoke to Scott Fisher, defendant's roommate. According to Sgt. Strickland, Fisher stated that he knew no one named Benny and no one by that name lived at the apartment. Strickland testified that he explained to Fisher that he was investigating a homicide. After being so informed, Fisher went back inside the apartment.
Thereafter, a car fitting the description of defendant's car was found in the apartment parking lot. Still having had no success in finding defendant, Strickland remained outside the apartment with the car, while the officers obtained a warrant to search defendant's car and his apartment. At about 6:00 a.m. on May 8, Lt. Keller returned with the warrant. Thereupon, the apartment and the car were searched; and the car was towed to the crime lab.
Later, between 9:30-10:00 p.m. on May 8, Lt. Cecil J. Jarreau, Jr., received a telephone call from Ms. Kelly Fields. Defendant then talked to Lt. Jarreau who convinced defendant to turn himself in to the police who needed to talk to him about Sheri Lynn Daigle. After talking to Lt. Jarreau, defendant came into the detective office with Ms. Fields; and defendant then waited about forty-five minutes for the arrival of Lt. Randy Keller.
After being advised of his Miranda rights by Sgt. Strickland, defendant signed an advice of rights and consent to questioning form at 11:17 p.m. in the detective office on May 8. Thereupon, defendant made an oral statement in the presence of Lt. Keller and Sgt. Strickland. Lt. Keller gave the following testimony relating to the contents of defendant's oral statement. Defendant denied that he killed the victim, but he said that Michael Hood had committed the offense. Defendant explained that, on May 6 at about 5:30-6:00 p.m., he met the victim at the corner of Sixth Street and Spanish Town Road. The victim was going to get her hibachi from her former residence at the Prescott Place Apartments. Defendant agreed to and gave her a ride in his car so that she would not have to walk with the heavy grill. While defendant was at the Prescott Place Apartments, a black, uniformed deputy sheriff approached him and questioned him as to why he was there and why he was parked in the deputy's parking space. Defendant stated that he moved his car to allow the deputy to park in the proper parking space. The victim returned with the hibachi, placed it in the back seat area of defendant's car and got into the car on the front passenger seat.
According to defendant, he and the victim then proceeded to his apartment in his car. There, he, Michael Hood and the victim went inside the apartment in which defendant and Scott Fisher lived. The three of them stayed inside for only a short time. An argument ensued as to whether Hood might be the father of the child with which the victim was then pregnant. Thereafter, at about 7:00 or 7:30 p.m., the victim asked defendant to borrow his car and its keys. She and Hood exited the apartment and left in defendant's car. Defendant stated that he never again saw the victim but that, at about 8:00 or 8:30 p.m., he saw his vehicle was in the parking lot and the keys were on the floorboard. He had instructed the victim to place the keys there when they returned the vehicle. At about 9:00 p.m., Fisher came home; and defendant remained in the apartment with Fisher all Wednesday night.
Lt. Keller testified that, at this juncture of defendant's oral statement, Sgts. Yarborough and Strickland brought Michael Hood to the detective bureau for a face-to-face confrontation with defendant. At the confrontation, defendant jumped up and yelled at Hood: "Why did you kill her." During Hood's testimony, he acknowledged that the confrontation had occurred. Hood testified that he did not kill the victim and that at the confrontation he had yelled at defendant that defendant was lying.
*379 Lt. Keller further testified, in regard to defendant's May 8 oral statement, that he asked defendant if he knew of the 10443 Siegen Lane location where the victim's body had been found and if he had ever resided in the house at the location. Defendant completely denied knowledge of the house and stated that he was unfamiliar with the area.
Defendant told Lt. Keller that he had been at his apartment, at about 2:43 a.m. on May 8, when Keller and the other officers came there and that he had exited the apartment through a window to get away from the officers. According to defendant, he fled because he had a Texas parole violation.
Lt. Keller further testified that he confronted defendant with information (based upon a check of jail records) that Michael Hood had been in parish prison between January 23, 1987, and April 30, 1987. Defendant reacted by changing his statement to the effect that the subject matter of the argument between the victim and Hood "might have been" in reference to Hood being the father of the victim's child.
Lt. Keller testified that, after that confrontation, he spoke to defendant again. Defendant continued to contend that Hood had been in defendant's apartment and had left there with the victim at about 7:00 p.m.
Thereafter, on May 9, 1987, at about 7:05 a.m., defendant was arrested (by Keller) for his Texas parole violation; and on May 11, 1987, Lt. Keller returned to the scene where the victim's body had been found. He met Sgt. Strickland there to photograph the location. The photographs were to be used to give defendant an opportunity to verify whether or not he had ever been to the location. A series of five photographs were taken, i.e., S-95 through S-99. S-95 depicted a fork in the road. S-96 depicted a close-up view of the mailbox. S-97 depicted the entranceway. S-98 depicted the fork in the road, weeds and the length of the driveway going to the abandoned house; and S-99 depicted a close-up view of the front of the house behind which the septic tanks were located.
Lt. Keller testified that, that same day (May 11), defendant was brought to the detective bureau. Defendant was again advised of his Miranda rights. Defendant then gave a taped statement which began at about 11:24 a.m. The record reflects that S-102 and S-103, excised versions of the original tapes, were introduced into evidence and played during the state's presentation of its case.[2]
The excised versions of defendant's May 11 taped statement reveal the following. Consistent with his oral statement, defendant related how he had given the victim a ride to pick up her hibachi and had returned with her to his apartment. However, he stated that he understood (through previous discussions with the police) that Michael Hood could not have been the father of the victim's child and that the argument inside his apartment between Hood and the victim concerned Hood's statements that he wanted the baby. Defendant continued to maintain that the victim asked his permission to use his car and that she and Hood left his apartment together. Defendant related that he then took a shower. When defendant finished his shower, he noticed his car was gone. Defendant stated that he then went to the Capital Grocery Store. Defendant left the store at about 8:30-9:00 p.m. When he got home, his car was parked in the driveway. According to defendant, the victim had his car for about an hour to one and one-half hours; but he did not know who actually drove the car. However, defendant stated that no one other than the victim had his car on May 6 or May 7.
Defendant stated that on May 6, Fisher came home at about 9:00 p.m. According to defendant, when he went to get in his car, there was a wet spot on the passenger seat. Defendant got a towel from inside his apartment and apparently placed it over the wet spot where Fisher seated himself. He and Fisher then went to a bar where *380 they stayed, before returning home between approximately 11:30 p.m. and midnight. On May 7, defendant woke up about 6:00 to 6:30 a.m. Before leaving for work, he telephoned his boss at Saia's Landscape to find out if they were going to work that day since it was raining. His boss telephoned him between 8:15 and 8:30 a.m. to tell him they would work. Defendant stated that he arrived at work at 9:00 a.m. He left his car at the shop and proceeded with his boss to a residential job site where he worked that day. Defendant got home from work at about 5:30 p.m. He and Fisher went out together that night. Later, after they returned home, a friend of Fisher's came to their apartment and inquired as to whether Fisher wanted some cocaine. Fisher apparently left the apartment. He later returned with some cocaine prior to the arrival of Lt. Keller and Sgts. Strickland and Yarborough during the early pre-dawn morning hours of May 8. Defendant stated that he heard the officers knock at the door and ask for "Benny." According to defendant, he had told Fisher that he was on parole and to tell the police he was not there. Initially, he and Fisher thought it was a "drug bust."
Defendant stated that he learned of the victim's death on May 7 while watching a television news broadcast. Consistent with his earlier oral statements, defendant denied any personal knowledge of the location where the victim's body was found; and he professed unfamiliarity with that part of East Baton Rouge Parish. Lt. Keller described the location as an old abandoned house about one-fourth mile down a muddy road leading from Siegen Lane. Still defendant denied any personal knowledge of the location.
At that juncture of defendant's taped statement, (as evidenced by Lt. Keller's testimony and the taped statement) Lt. Keller displayed S-95 through S-99 (the photographs of the location) to defendant. In regard to each of the photographs, defendant specifically denied having ever seen the location depicted in the pictures.
When questioned as to his knowledge of Dawn Harding, defendant stated that he knew her through his deceased foster father. Dawn and her family lived in a building on Plank Road. In reference to the house where the victim's body was found, defendant stated that he did not know if Dawn and her mother ever lived there. He emphatically denied ever going to that house. Thereafter, when Lt. Keller asked defendant if that house was not the one defendant had visited several times with his girlfriend, Laura, defendant initially answered in the negative. He then stated that he had been to the house but denied knowledge that it was the site where the victim's body was found. He also stated that he had brought Laura and her father to that house.
Defendant stated that he had made telephone calls to Laura. After first saying that he did not tell Laura "anything," defendant told the officers that he had asked Laura if she had heard anything about the instant homicide but that he could not remember making any comments to her about the house where the body was found. Defendant then stated that he "possibly" made comments to Laura about the house. At that point, the taped interview was concluded; and subsequently, Lt. Keller obtained an arrest warrant for defendant in regard to the instant offense.
Jacqueline Haydel testified that on May 6, when it was "getting close to dark or after dark," Hood knocked on her door and invited her to dinner at his apartment. She accepted the invitation and remained at Hood's apartment until 10:00 p.m. The testimony of Michael Hood and Dorothy Forbes revealed that, when the victim failed to return to Hood's apartment with her hibachi, they changed their plans to barbecue chicken and fried the chicken instead.
Forbes stated that Hood left for about five minutes to go get the chicken from the Capital Grocery Store and that he never left again after returning with the chicken. Hood testified that he did not go any place that night and that he was required in connection with his DWI conviction to abide by a 7:00 p.m. curfew.
*381 Nick Dalrymple testified that he supervised Hood as a condition of Hood's release on bond. On May 6, he visited Hood's apartment between 7:00-8:00 p.m. At that time, he photographed Hood and Hood's girlfriend who were home. Dalrymple stated that he remained at Hood's residence for about ten to fifteen minutes.
Thomas E. Hart testified that he has a daughter named Laura and knows defendant. Approximately a couple of years ago, at defendant's direction, he went to the house located at 10443 Siegen Lane accompanied by defendant. Laura Cramer testified that Mr. Hart is her father and that she had had an "off and on" romantic relationship with defendant. Cramer stated that, in approximately August or September of 1986, she dropped defendant off at that house and picked him up there a couple of times. Additionally, Cramer stated that she knew that defendant "stayed there."
Laura Cramer testified that on May 8, 1987, she came home from work early, between 3:30 and 4:00 o'clock, and found defendant sleeping in her bed. She had not given defendant a key to her apartment and had not told him he could sleep there. She summoned the police and returned to her apartment with the police, only to find that defendant was gone.
Cramer testified that, on the following day, defendant telephoned her and talked to her. Cramer testified in regard to the substance of their conversation as follows:
He said something to the effect of had I seen the paper or had I seen what had happened, and I said, yes. And he asked me, you know, did I see where it happened? And I said, yes. He said something about wasn't that wild or crazy or, you know, something along those lines, and I said, yes. And he asked me if I had told anybody that I had been there or I knew where the place was, and I said, no. And he said he hadn't told anybody and asked me not to tell anybody.
Later that day, defendant had another conversation with Cramer. In regard to the subject matter of that conversation, Cramer stated the following: "About all I remember was he asked me again if I had told anybody where the place was, and said something to the effect that he hoped I didn't `f' him over." Cramer further stated that, thereafter, defendant telephoned her at home and at work until she finally had her telephone number changed. During these conversations, she talked to defendant only long enough to ask that he not call her again.
Roy G. Skiba testified that he previously lived in the house located at 10443 Siegen Lane for about two years with his mother, brother, and sister (Dawn Harding). He stated that the house could not be seen from the street. Skiba knows defendant. Defendant came to the house during the time he, his mother, brother and sister lived in the house. Defendant used to come there every couple of days, staying there a couple of hours at a time or overnight until Dawn moved in with defendant at another location where they lived together.
Skiba stated that to the rear of the house there was (were) a septic tank(s). On occasion, he mowed the area behind the house; and defendant was with him after the area was mowed. According to Skiba, from where he and defendant were standing, the septic tanks could be seen.
The record reveals that, while Lt. Keller was on the witness stand, his trial testimony was interrupted to play the tapes of defendant's May 11 taped statements. The record also reveals that, after the tapes were played, Lt. Keller identified the statements as those defendant had made to him and Sgt. Yarborough. In regard to those statements, Lt. Keller testified that, when he confronted defendant with the fact defendant had been to the house at 10443 Siegen Lane, defendant's demeanor changed. In explaining the change of demeanor, Lt. Keller testified that, during the first part of defendant's taped statement, defendant was very calm and collected. However, when confronted with "lie after lie," defendant began shaking and his eyes "teared up." Defendant seemed to be getting extremely upset.
*382 During the course of the investigation of the scene where the victim's body was found, a hibachi was found on the afternoon of May 11 on the ground in some weeds in front of the house located there. S-58, the hibachi, was introduced into evidence at trial. Paul Joseph Beatty identified S-58 as his hibachi which he noticed, on May 6 at about 11:00 p.m., was gone from his front porch where he usually kept it. The defense stipulated that Derrick M. Foxx would testify that S-58 was the hibachi he saw the victim carrying. Additionally, Vince Fender testified that S-58 was positively the hibachi that Beatty and the victim had at their apartment.
Elgin Campbell testified that the 10443 Siegen Lane location is a wooded area across the street from his house. He stated that there were two houses back there about one and one-half years ago when he last went back there. Campbell stated that he "think[s]" that, in the wintertime, the outline of one of the structures can be seen (apparently from Siegen Lane) but that generally only woods can be seen from that vantage point.
On May 7, 1987, at daybreak, Campbell was at the end of his driveway. At that time, he heard a car and looked toward the gravel/dirt road leading to 10443 Siegen Lane. The noise sounded loud "like a muffler off of an exhaust system of a car." The vehicle was unlighted and coming out on the gravel/dirt road. Because it was not yet daylight, he could not determine the color of the car; and he only saw the basic outline of the car. It seemed strange to Campbell; there had not been any traffic in or out of the road for months. Campbell also found it strange that the car's lights were not illuminated. For those reasons, he took note of what he had seen. Campbell stated that the general outline of the car depicted in S-65 and S-66 (the photographs of defendant's car) was familiar to him and that there was nothing "about the car" depicted in S-65 and S-66 that was different from the car he had observed coming down the gravel/dirt road on May 7. Campbell further testified that he had viewed the car depicted in S-65 and S-66 at the State Police Crime Laboratory. When he looked beneath the car, he observed that it had a "real bad" exhaust system that would have made a "lot of noise." Although he stated that the car "resembled" the car he had seen on the gravel/dirt road, Campbell was unsure of the year/model of the car he had seen on the gravel/dirt road. He estimated it to be a '77 or '78 car and stated that it looked like a Cougar or Montego. Campbell repeated that he only saw the outline of the car, and he stated that he could not rule out the hypothesis that the car he had viewed at the crime lab was not the car he had seen coming out on the gravel/dirt road.
Charles Guarino qualified and was accepted by the trial court as an expert in the field of forensic serology. He testified that he examined S-58, the hibachi, for blood stains, tissue and hair but found none on it. Tests he performed to detect seminal fluid on a vaginal swab from the victim produced negative results. Guarino's testimony also revealed that he checked defendant's car for blood and seminal fluid but found none. Guarino also vacuumed the car to determine if he could find a metal flake or piece of decorative glitter in the car that could be matched with two pieces of metal flake or glitter that had been removed from the victim's head injuries during the autopsy. However, Guarino found nothing in defendant's car that resembled the flakes or glitter.
The state and the defense stipulated that, if called as a witness, Carol Richard would be qualified as an expert in the field of fingerprint comparison and would testify that she received fifteen latent prints obtained from defendant's car. Fourteen of those prints were unidentifiable, and the one identifiable print was that of defendant.
Jim Churchman, a Louisiana State Police Crime Laboratory forensic scientist, qualified and was accepted by the trial court as an expert in the field of forensic physical comparisons. The record reflects that Churchman compared a rubber cast, S-85, that had been made by the police of the tire track impression found in the driveway of 10443 Siegen Lane to the tires on defendant's *383 car. In making his comparisons, Churchman determined that the thread design of the front tires on defendant's car were totally different from those in the rubber cast. Both rear tires on the car were of the same brand, but the right rear tire had slightly different wear characteristics and was eliminated as being the tire which made the cast impression. In regard to the rubber cast, Churchman stated that it was of a "very poor or somewhat vague impressionin dirt." Churchman determined that the left rear tire from defendant's vehicle possessed the same tread design and similar wear characteristics as those in the rubber cast. However, he could not make a positive identification that the tire that made the impression on which the rubber cast had been poured was the left rear tire from defendant's car. Thus, Churchman could not rule out either the hypothesis that the impression was of that tire or some other tire.
Churchman also testified that he examined the muffler on defendant's car. During this examination, he noticed that the muffler had a hole in it.
Mary Doughtie, defendant's sister, testified that she had received a letter from the Texas Department of Corrections inquiring as to defendant's whereabouts. Thereafter, in January of 1987, she informed defendant that the parole office in Houston, Texas, was looking for him and wanted to know his address.
D-20, a certified copy of a pen pack from Texas, was introduced in evidence by defendant. An examination of this exhibit reflects that George Bernard Brown was convicted of the offense of theft from a person on November 9, 1981, in Texas for which he received a ten year probated sentence subject to various conditions.
Scott Fisher testified that in May of 1987 he was living at 555 Spanish Town Road in apartment number six and that defendant was his roommate. Fisher stated that during that time frame he was working at the Capital Grocery Store. On Wednesday, May 6, 1987, Fisher worked at the Store; and, at about 5:30-6:00 p.m. that day, he saw defendant at the Store. Defendant stayed there for a few minutes. Later that day at about 9:05 p.m. after work, Fisher saw defendant at their apartment. Fisher took his dog for a walk. After he returned to the apartment, he and defendant left the apartment at about 10:00 p.m. to shoot pool. Before leaving to shoot pool, defendant had gone out to his car with a towel and had informed Fisher that he had spilled something on the seat in his car. When they left in the car to shoot pool, Fisher rode on the passenger seat. When he got up from the seat, he felt moisture. At about 12:30-1:00 a.m. the following morning, they returned to their apartment. Fisher stated that he had no knowledge of defendant leaving the apartment after they went to bed. Fisher got up the next morning at about 7:30-8:00 a.m. but did not see defendant at that time. However, prior thereto at about 7:00 a.m., the telephone rang; and, after Fisher picked up the telephone receiver to answer the telephone, he placed the receiver back on the telephone because it had been answered (apparently by defendant). Fisher next saw defendant at the Capital Grocery Store later that day (May 7) at about 5:30-6:00 p.m. After work, Fisher and defendant went out and shot pool (as they had done on the preceding day). They returned to their apartment at about 1:30-1:45 a.m. on (Friday) May 8. Thereafter, Fisher left in defendant's car and went to a bar where he purchased some cocaine. Fisher then returned to his apartment with the cocaine. Subsequent thereto, Detectives Keller and Yarborough came to the apartment. At this first encounter with the detectives, the detectives informed Fisher that they wanted to talk to Benny Brown. According to Fisher, the detectives were very abrupt. Fisher testified that he lied to the detectives because he was scared and felt threatened by Keller's personality. Elaborating, Fisher explained that the cocaine was inside the apartment; and he and defendant thought the police wanted the narcotics he had purchased. Following this first encounter, the detectives returned to the apartment. At this second encounter, the detectives informed Fisher they were there in regard to a serious matter, i.e., the investigation of *384 the murder of a girl. The detectives questioned Fisher as to his knowledge of the victim and the whereabouts of a hibachi. Fisher would not allow the detectives to come into the apartment. Fisher went inside the apartment and informed defendant that the police were investigating the murder of a girl. In response, defendant stated that he had some trouble with a female probation officer. According to Fisher, defendant was in a state of panic. Fisher admitted that he had told the detectives that defendant was "acting like a caged animal" but he explained that he and defendant were "in a panic." After the second encounter, Fisher had a third encounter with the police. At this encounter, Fisher went outside his apartment. The police pointed to defendant's car and asked Fisher if he had previously seen the car. Fisher responded with a lie, denying that he had previously seen the car. Fisher testified that he was still scared at the third encounter because he had used the car to make the drug purchase. Before returning to his apartment, Fisher talked to a friend; and when Fisher returned to the apartment defendant was gone.
Salvador Saia, a landscape contractor, testified that defendant worked for him for about three weeks during May of 1987. On May 7, 1987, at about 7:30 a.m., Saia talked to defendant on the telephone when defendant telephoned him to determine if they would work that day. Later, at about 8:00 a.m., Saia telephoned defendant, advising him to come to work. At about 8:30 a.m. defendant arrived for work at Saia's shop. Defendant left his car at the shop, and he and Saia went to the home of Ms. Erica Carpenter in Saia's van. Saia and defendant worked at Ms. Carpenter's until about 5:00 p.m. During this work period at Ms. Carpenter's home, Saia was with defendant the entire time except for about forty-five minutes (between about 11:00-11:30 a.m. and about 12:00-12:15 p.m.) when Saia left defendant alone at the work site. During this approximate forty-five minute period, defendant had no transportation; and, when Saia returned to the worksite, he observed work defendant had done during his absence.

ASSIGNMENT OF ERROR NO. ONE:
In this assignment, defendant contends that the trial court erred by denying his motion for post-verdict judgment of acquittal. Defendant argues that the evidence of his identity as the perpetrator of the instant offense, which is entirely circumstantial, does not exclude every reasonable hypothesis of his innocence.
The constitutional standard for testing the sufficiency of evidence, enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime charged and defendant's identity as the perpetrator of that crime beyond a reasonable doubt. See State v. Moore, 477 So.2d 1231, 1233 (La.App. 1st Cir.1985), writs denied, 480 So.2d 739, 741 (La.1986). This standard is codified in LSA-C.Cr.P. art. 821. When circumstantial evidence is used to prove the commission of a crime, LSA-R.S. 15:438 provides that, assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. Ultimately, all evidence, both direct and circumstantial, must be sufficient to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. State v. Rosiere, 488 So.2d 965, 968 (La. 1986).
The evidence in this case amply proved beyond a reasonable doubt that Sheri Lynn Daigle was the victim of a (second degree) murder. Thus, the question before us is not whether or not the evidence was legally sufficient to prove the essential elements of the charged offense of second degree murder itself but, rather, whether or not the evidence was legally sufficient to prove defendant's identity as the perpetrator of this crime.[3] As noted by *385 defendant, the evidence concerning the requisite element of his identity as the perpetrator was entirely circumstantial.[4] We now focus our attention on the evidence introduced at trial and the various inferences which may reasonably be drawn from that evidence as proof that defendant perpetrated the instant offense.
On the evening of May 5, Michael Hood saw defendant and the victim engaging in a conversation. Hood did not hear what they were saying; but, when he later asked the victim what the topic of the conversation was, she told him that "[defendant] wanted to have sex with her, and she didn't want anything to do with [defendant]."[5] Pursuant to State v. Brown, 562 So.2d 868 (La. 1990), Hood's recounting of the victim's disclosure of the subject matter of her conversation with defendant was admissible only to show that the victim was not sexually interested in defendant and to prove circumstantially her subsequent conduct, i.e., that (if defendant made sexual advances toward her) she would reject his sexual advances. This disclosure was particularly illuminating in light of Kimberly Cagle's testimony which revealed that on May 6, at about 5:00 p.m., defendant told her that he "needed to have a woman."[6]
On the evening of May 6 between approximately 5:00-6:45 p.m., several witnesses either saw defendant and the victim together in Spanish Town or saw the victim riding as a passenger in a car which they identified as the car depicted in S-65 and S-66 (the photographs of defendant's car) with defendant driving the car in the Spanish Town area. At about 5:30-6:00 p.m. that day, Derrick M. Foxx saw the victim get into the same car with the hibachi at the Prescott Place Apartments. According to Foxx, the car was being driven by defendant; and, in his May 9 oral statement to the police, defendant admitted to these facts which were revealed in Foxx's testimony. Foxx's testimony further revealed that, when he saw the victim get into defendant's car with the hibachi, the victim was dressed in clothing which matched that found on her body when it was removed from the septic tank. None of these witnesses ever again saw the victim alive after last seeing her with defendant on the evening of May 6.
During the police investigation of the instant offense, a hibachi (S-58) was found in some weeds in front of the house at 10443 Siegen Lane. This hibachi was positively identified as Beatty's hibachi, and *386 the state and the defense stipulated that it was the hibachi Deputy Foxx had seen the victim carrying.
When the victim's body was removed from the septic tank, her blue jeans were found unzipped and pulled down to her pubic area. Testing of a vaginal swab from the victim failed to detect the presence of seminal fluid. Regarding the presence of a laceration and contusions to the victim's chin, detected during the autopsy, Dr. Suarez's opinion as an expert in the field of forensic pathology was that these injuries might have been inflicted by a fist or blunt object; but the doctor also opined that these injuries could have been caused by placing the victim head first inside the septic tank. Nevertheless, a reasonable inference could be drawn from these circumstances that someone may have had sex or attempted to have sex with the victim.
Dr. Suarez's expert opinion was that the victim had died as a result of inhalation of some of the contents of the septic tank, although head injuries the victim had sustained (by being struck about the head with an instrumentality) were sufficient to have caused the victim's death. In the doctor's expert opinion, the victim died between six and twenty-four hours prior to the discovery of the body at about 7:00 p.m. on May 7, i.e., between approximately 7:00 p.m. on May 6 and 1:00 p.m. on May 7.
At about daybreak on May 7, Elgin Campbell sighted a car with its headlights unilluminated coming out of the driveway at 10443 Siegen Lane. While Campbell only observed the basic outline of the car, he indicated that its outline was no different from the outline of the car depicted in the photographs of defendant's car. When Campbell observed the car exiting the Siegen Lane location, he heard noise from a noisy muffler system. Later, during the police investigation of the instant crime, Campbell looked beneath defendant's car and saw that it had a "real bad" exhaust system that would have made plenty of noise.
Jim Churchman gave testimony (as an expert witness in the field of forensic comparisons) that, when he compared the tread design on the tires on defendant's car to those in the rubber cast made of the tire track impression found in the driveway at 10443 Siegen Lane, he determined that the left rear tire from defendant's car had the same tread design and similar wear characteristics as those in the rubber cast. Although Churchman could not make a positive identification that the tire which had made the impression on which the rubber cast had been poured, he could not rule out the hypothesis that the impression was of the left tire on defendant's car. Churchman also examined the muffler on defendant's car and found that the muffler had a hole in it.
The house behind which the victim's body was discovered was in an extremely secluded area off Siegen Lane. The distance from the front of the house to Siegen Lane was approximately six hundred and forty-two feet. According to Elgin Campbell, who lived across the street from the location at 10443 Siegen Lane, someone viewing the location from Siegen Lane could generally see only woods, although the outline of a structure at the location could be seen from Siegen Lane in the wintertime. Until Campbell saw the unlighted vehicle coming out of the driveway at 10443 Siegen Lane on the morning of May 7, he had not been aware of any traffic in or out of the driveway for months.
The area behind the house at the Siegen Lane location (in which the septic tanks were situated) was extremely overgrown, as reflected by the testimony of several witnesses including Chuck Smith, Charles Hughes, Carson Bueto and Don Strickland. The pathway through this overgrowth was narrow (about eighteen inches wide). The testimony given by Chuck Smith and Randy Keller reflected that this pathway had been recently formed by trampling down the overgrowth. Due to the thickness and height of overgrowth described by the witnesses and the circumstance that the pathway led directly to the septic tanks where the body was found, it could reasonably be concluded that the pathway had been formed by the individual who had placed the victim's body in the septic tank and *387 that that person had prior knowledge of the location of the septic tanks.
Testimony given by Thomas E. Hart, Laura Cramer and Roy G. Skiba revealed that defendant knew about the Siegen Lane location; and Skiba's testimony further revealed that defendant had been with him in the area behind the house at the location where the septic tanks were located after the area had been mowed and that at that time the septic tanks were observable from where defendant was standing.
In both his May 8 oral statement and his May 11 taped statement, defendant lied about his knowledge of the house at the Siegen Lane address. He made efforts to conceal this knowledge by asking Laura Cramer not to disclose to anyone that he knew about the location; and, on one occasion, he remarked to Cramer that he "hoped [she] didn't `f' him over" by telling anyone that he knew about the location.
Lt. Keller's testimony revealed that, during defendant's May 11 taped statement, defendant's demeanor changed when he was confronted with the fact that he had been to the house at 10443 Siegen Lane. When confronted with "lie after lie," defendant's demeanor changed from that of a person who had been calm and collected to a person who began shaking with his eyes "teared up." These circumstances raise the inference of a guilty mind. See State v. Guirlando, 491 So.2d 38, 41 n. 4 (La. App. 1st Cir.1986).
Viewing all of the evidence introduced in this case, both direct and circumstantial, in the light most favorable to the state, we find that any rational trier of fact could have concluded beyond a reasonable doubt and to the exclusion of any reasonable hypothesis of innocence that defendant committed the second degree murder of Sheri Lynn Daigle. Hence, this assignment lacks merit.

ASSIGNMENT OF ERROR NO. TWO:
By means of this assignment, defendant contends that the trial court erred by denying his constitutional right to present a defense by excluding the introduction of the testimony of Detective Don Strickland recounting an exculpatory statement of Jamie Gary, a ten year old girl, made to Strickland during the investigation of Sherri Lynn Daigle's homicide. Defendant asserts that the excluded testimony was critical to his defense because it refutes the state's theory as to the time of the victim's death and would have allowed him to prove an alibi for the later time of death which would have been established through the excluded testimony.
Prior to trial, defendant filed a motion in limine in the district court requesting that the court permit the hearsay testimony of Detective Strickland as to Jamie Gary's statement to him that she saw the victim at approximately 3:00 p.m. on Thursday, May 7, 1987, the same day the victim's body was discovered. In the motion, defendant asserted that the statement was essential to his defense, and that he had exercised due diligence in his efforts to locate, interview, and subpoena Jamie Gary, all of which efforts were unsuccessful. Defendant's motion concluded that he had no means of presenting Gary's statement except through Strickland's hearsay testimony.[7]
On the first day of the trial, prior to jury selection, the trial court conducted a hearing on defendant's motion in limine. At the hearing, defense counsel conceded that there had been some error in Jamie Gary's statement to Strickland insofar as Gary's statement indicated that, at the time she saw the victim on May 7, the victim was getting into a car that Gary later identified as defendant's car. Defense counsel elaborated that the above referenced portion of Gary's statement reflected erroneous recollection by the child because there would be testimony given during the trial indicating the car Gary saw the victim get into could not have been defendant's car; however, defense counsel maintained that (although the child was mistaken about the car being defendant's car) Gary was not mistaken about the identity of the victim, a person *388 she knew. Defense counsel argued that in light of her unsuccessful efforts to locate Jamie Gary and Jamie's mother, the child's testimony was unavailable and that the presentation of the child's statement through Detective Strickland's testimony was critical to the defense because it narrowed the time frame within which the victim was murdered. The state objected to the motion on the basis that Strickland's testimony as to the child's statement to him was hearsay as to which the state would have no opportunity to cross-examine the child. Without articulating any reasons for its ruling, the trial court denied defendant's motion. Later, during trial Strickland took the stand as a state witness; and, during his cross-examination, Strickland testified that during his investigation of the instant offense he spoke to Ms. Gary, a ten year old female. At that juncture of Strickland's testimony, defense counsel propounded the following question to Strickland: "Did you receive information that the victim was seen on Thursday, May 7, in the afternoon?" The prosecutor objected to the question; and, out of the jury's presence, the trial court ruled (in conformity with its earlier ruling denying defendant's motion in limine) that defense counsel could ask Strickland if he had received information from Jamie Gary provided defense counsel did not include any of the content of Gary's statement to Strickland in the question she would propound to Strickland. Thereafter, upon resumption of defense counsel's cross-examination of Strickland, (in conformity with the trial court's ruling) she asked Strickland if he had received information from Jamie Gary and Rebecca Gary (Jamie's mother) on Monday, May 11; and Strickland answered in the affirmative.
Defendant correctly concedes that the statement of Jamie Gary, which he sought to elicit through Strickland's testimony, is hearsay. It is also clear that the statement does not fit into any of the recognized exceptions to the hearsay rule whereby it would be admissible.
A criminal defendant has a constitutional right to present a defense. U.S. Const., Amendments VI, XIV; La. Const. Art. I, § 16. See State v. Webb, 424 So.2d 233, 237 (La.1982); State v. Washington, 386 So.2d 1368, 1373 (La.1980). While hearsay should generally be excluded, if it is reliable and trustworthy and its exclusion would interfere with the defendant's constitutional right to present a defense, it should be admitted. State v. Gremillion, 542 So.2d 1074, 1078 (La.1989).
In this case, the defense sought to utilize Gary's statement that she had seen the victim alive at about 3:00 p.m. on the day her body was found four hours later. According to Dr. Suarez's expert opinion, the victim had died between six and twenty-four hours before the discovery of her body in the septic tank. The doctor stated that the rigor and circumstance of the body having been submerged underground were probably more consistent with death having occurred twenty-four hours before the body was found; however, the doctor was unable to exclude the hypothesis that death had occurred as late as 1:00 p.m. on May 7. Clearly, Jamie Gary's statement is in direct conflict with Dr. Suarez's expert testimony since the statement indicates that the victim was seen alive by Gary approximately two hours after the latest hour the victim could have died according to the opinion expressed by Dr. Suarez. In addition to this direct conflict with the expert evidence of the time of the victim's death, there is not one shred of other evidence that corroborates Jamie Gary's statement. As conceded by the defense, Gary could not have seen the victim get into defendant's car at the time she allegedly saw the victim on May 7 (a time at which evidence introduced at trial established that the car was at Salvador Saia's shop). Moreover, the statement included a description of the clothing worn by the victim at the time of Gary's alleged sighting of the victim that matched the attire found on the victim's body and the clothing Deputy Foxx described as that worn by the victim when he saw the victim get into defendant's car on May 6. Therefore, it could reasonably be concluded that it was more probable that Jamie Gary had seen the victim get into defendant's car on May 6 rather than on the following day. Under the circumstances, we find the hearsay *389 statement defendant sought to introduce was unreliable and untrustworthy and its exclusion did not interfere with defendant's constitutional right to present a defense.
This assignment lacks merit.

ASSIGNMENT OF ERROR NO. THREE:
In this assignment, defendant asserts that the trial court erred by denying his motion for a mistrial based upon the state's elicitation of a state witness' testimony concerning a threat allegedly made by defendant. Defendant argues that the testimony at issue was solicited by the prosecutor and that, pursuant to LSA-C.Cr.P. Art. 771, the prejudice which was created by this testimony was not cured by the trial court's admonition to the jury to disregard the testimony. Defendant concludes that, because an admonition was insufficient to assure him a fair trial under Art. 771, he was entitled to a mistrial.
The testimony concerning the alleged threat forming the basis for this assignment was given by state witness Roy G. Skiba on direct examination immediately after Skiba testified that he had lived at the house located at 10443 Siegen Lane for a couple of years; that he knows defendant; that defendant visited his sister, Dawn Harding, every couple of days at that house; and that on an occasion (after the area behind the house had been mowed) he and defendant were standing in the area of the septic tanks where the tanks could be seen. The prosecutor's question and Skiba's response which referred to the alleged threat at issue in this assignment are as follows:
Q. Did he ever help you try to clean out the septic tank?
A. He triedhe tried to unstop a line with my sister, yes, ma'am, and he threatened to throw her in.
Thereupon, defense counsel asked that the jury be retired from the courtroom. After the court granted the request, defense counsel moved for a mistrial on the basis of Skiba's testimony concerning defendant's alleged threat to throw Dawn Harding into one of the septic tanks. In response, the prosecutor stated that she was not trying to elicit the answer given by Skiba when she asked him if defendant had ever helped him clean out the septic tank and that, thus, the answer was not responsive to her question. The trial court then questioned Skiba and determined that Skiba was not present when the alleged threat was made. Instead, Skiba's mother and sister told him about it. Additionally, Skiba stated that he "guess[ed]" that the alleged threat had been made in a joking manner. In issuing its ruling denying the requested mistrial, the trial court stated that it would admonish the jury to completely disregard the witness' last statement and inform the jury that that statement was not based on information personally known by the witness and known by the witness to be true. After the jury was returned to the courtroom, the trial court so admonished and informed the jury.
LSA-C.Cr.P. Art. 771 provides in pertinent part:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
* * * * * *
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
Mistrial under this article is at the discretion of the trial court and should be granted only where the prejudicial remarks of the witness make it impossible for a defendant to obtain a fair trial. State v. Feet, 481 So.2d 667, 672-673 (La.App. 1st Cir. *390 1985), writ denied, 484 So.2d 668 (La.1986). The trial court's ruling as to whether a fair trial is impossible or whether an admonition is adequate to assure a fair trial when a prejudicial remark or comment does not fit within the mandatory provisions of LSA-C.Cr.P. Art. 770 will not be disturbed on appellate review absent an abuse of discretion. State v. Narcisse, 426 So.2d 118, 133 (La.), cert. denied, 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983). An examination of the prosecutor's question, the witness' response, and the context in which the question and response appear reveals that the witness' answer was unsolicited and unresponsive. Unsolicited and unresponsive testimony is not chargeable against the state to provide a ground for reversal. State v. Michel, 422 So.2d 1115, 1118 (La.1982). In this case, the trial court correctly determined that an admonition was sufficient. Hence, the harsh remedy of a mistrial was not required to preserve defendant's right to a fair trial.
This assignment lacks merit.

ASSIGNMENT OF ERROR NO. SIX:
By means of this assignment, defendant contends that the trial court erred by granting the state's motion to have the jury view the scene at 10443 Siegen Lane during the trial. To support his claim that granting the state's motion was an abuse of the trial court's discretion, defendant submits that the scene on March 16, 1988, (the third day of trial) was substantially different from that which existed on May 7, 1987, (the date the victim's body was discovered); the trip to the scene was an unnecessary interruption of the trial in light of the numerous photographs of the scene and the diagram of the scene (which the state introduced) and aerial photographs of the scene presented in evidence by the defense; the trip to the scene was designed solely to inflame the jury and lengthen the state's presentation of its case-in-chief; and balancing the prejudicial impact viewing the scene had on the jury against the small, if any, probative value of viewing the scene, the trial court should have denied the state's motion.
On the first day of trial (March 14, 1988), the state filed a written motion to have the jury view the scene; and, at the beginning of the first day of the trial prior to the jury selection, the court heard arguments by the state and the defense on the motion. After stating that it would probably grant the state's motion, the trial court indicated it would issue a ruling on the motion before opening statements were made to the jury. On the following day, during the jury selection process, the trial court informed the prosecutor and defense counsel that, because of the large area encompassed by the scene where the victim's body was found and possible problems of photographs depicting the scene, the court would grant the state's motion to have the jury view the scene if the sheriff was able to coordinate the transportation and logistics involved in such a viewing.
The record reflects that on March 16, 1988, at 3:25 p.m., (the third day of trial) during the state's presentation of its case-in-chief, the jury, the trial judge, defendant, the prosecutor, defense counsel, and other court personnel left the courthouse en route to the Siegen Lane location where they arrived at 3:47 p.m. Later, at 4:35 p.m. (fifty-eight minutes after their departure from the courthouse), they returned to the courthouse from the crime scene.
LSA-C.Cr.P. Art. 762(2) provides, in pertinent part, that a trial court may, in its discretion, hold its court session in places within the parish other than the courthouse:
To allow the jury or judge to view the place where the crime or any material part thereof is alleged to have occurred, or to view an object which is admissible in evidence but which is difficult to produce in court.
It is well-settled that the decision regarding whether to grant or deny a motion to have the jury view the scene of the crime is within the sound discretion of the trial court, and such a ruling will not be disturbed on appeal absent an abuse of that discretion. LSA-C.Cr.P. Art. 762(2); State v. Moore, 432 So.2d 209, 216 (La.), cert. denied, 464 U.S. 986, 104 S.Ct. 435, 78 *391 L.Ed.2d 367 (1983). Under the circumstances of the instant case, we find that the trial court did not abuse its discretion in granting the state's motion to have the jury view the Siegen Lane location.
This assignment is meritless.

ASSIGNMENT OF ERROR NO. NINE:
By means of this assignment, defendant contends that pursuant to LSA-R.S. 44:3; State v. McEwen, 504 So.2d 817 (La.1987) and State v. Shropshire, 471 So.2d 707 (La.1985), he was entitled to the entire twenty-seven page police report of Detective Don Strickland and not just the first four pages and a portion of the fifth page of the report which this Court determined was public record to which defendant was entitled in State v. Brown, No. KW 87 1663 (La.App. 1st Cir. Dec. 22, 1987), writ denied, 516 So.2d 374 (La.1988).
In Brown, this Court granted the state's application for supervisory writs and reversed the trial court's October 22, 1987, ruling that defendant was entitled to the entire twenty-seven page report of Detective Strickland. After examining the entire report of Detective Strickland in light of LSA-R.S. 44:3, the McEwen and Shropshire cases and other jurisprudence, this Court concluded that, under LSA-R.S. 44:3A(4), only an initial police report was public record and that the statute excluded from the public record "any followup or subsequent report or investigation."[8] We noted that, while the Shropshire decision recognized such a line of demarcation, neither it nor the statute offered any guidelines as to where to draw the line between an initial police report and a report on a subsequent investigation. We further noted that it was obvious that such a line must be drawn. Hence, after examining the report of Strickland, we found specifically that the initial report consisted of only the first four pages and a portion of the fifth page of the report ending with a specific sentence which we quoted in our decision; we found that the remaining portion of Strickland's report was a report of a followup or subsequent investigation not constituting public record. Accordingly, we ordered the state to provide defendant only the portion of Strickland's report which we found to constitute the initial police report; and we remanded the case to the trial court for further proceedings consistent with our expressed views.
In this appeal, defendant has presented no new arguments to this Court. Therefore, we maintain our previous ruling expressed in KW 87 1633 referenced above. Cf. State v. Daniels, 552 So.2d 781, 784 (La.App. 1st Cir.1989, writ denied, 558 So.2d 581 (La.1990).
This assignment lacks merit.

ASSIGNMENT OF ERROR NO. TEN:
By means of this assignment, defendant contends that the trial court erred by sustaining the state's objection to testimony regarding the victim's state of mind in reference to her former boyfriend, a possible suspect.
During Vince Fender's cross-examination, Fender stated that the victim had introduced him to "Darryl who drives a white Trans Am." Immediately thereafter, *392 defense counsel asked Fender: "What did [the victim] tell you about Darryl in the white Trans Am?" The trial court sustained the prosecutor's general objection to this defense question. On appeal, without disclosing how the testimony sought to be elicited through the disallowed question was admissible as evidence of the victim's state of mind, defendant vaguely asserts that the testimony was admissible to show that someone other than defendant had an opportunity to commit the instant offense. However, the record does not reflect that defendant ever articulated to the trial court that the testimony he sought to elicit was admissible on the basis argued on appeal; and contrary to defendant's assertion on appeal that the trial court refused to allow defense counsel to argue the admissibility of the testimony in question, the record fails to reflect any such refusal by the trial court. However, the record does reflect that, instead of arguing the ground for admissibility of the testimony argued on appeal, defense counsel argued only one completely different ground for objection, i.e., that the testimony sought to be elicited through the disallowed question was admissible as an exception to the hearsay rule because the person making the statement (identified only as "Darryl who drives a white Trans Am") was unavailable due to his death. Because the ground argued on appeal for admissibility of the testimony was never articulated to the trial court, it represents a new ground for objection not properly before this Court which cannot be raised for the first time on appeal. See LSA-C.Cr.P. Art. 841; State v. Brown, 481 So.2d 679, 686-687 (La.App. 1st Cir.1985), writ denied, 486 So.2d 747 (La.1986).
Accordingly, this assignment lacks merit.

ASSIGNMENT OF ERROR NO. THIRTEEN:
By means of this assignment, defendant submits that the trial court erred by denying his motion for mistrial on the basis that (during a recess of the trial) three members of the jury viewed defendant, while he was dressed in prison garb and handcuffed, being escorted by a deputy sheriff in the lobby of the courthouse and outside the courthouse (i.e. across the street and in the parking lot). Defendant argues that this alleged viewing of him by the three jurors prejudiced him by eroding or destroying his presumption of innocence, a prejudice which could not be overcome.
Ordinarily, a defendant before the court should not be shackled or handcuffed or garbed in any manner destructive of the presumption of his innocence and of the dignity and impartiality of judicial proceedings. State v. Smith, 504 So.2d 1070, 1078 (La.App. 1st Cir.1987). If a defendant objects at trial to his being shackled, handcuffed or attired in prison garb, for a finding of reversible error the record must show an abuse of the trial court's reasonable discretion resulting in clear prejudice to the accused. State v. Wilkerson, 403 So.2d 652, 659 (La.1981).
In the instant case, on Saturday, March 19, 1988, at the conclusion of the presentation of evidence by the state and the defense, the trial was recessed until the following Monday at 9:00 a.m. When the trial resumed on Monday (out of the jury's presence) defense counsel moved for a mistrial based on the jurors' having allegedly viewed him in prison garb and handcuffed while being escorted by a deputy sheriff on the preceding Saturday after the trial court recessed the trial. When questioned by the trial court as to which three jurors had allegedly viewed defendant, defense counsel stated that defendant could clearly identify only one of the three jurors involved, Ms. Spikes, and that he could identify the other two only as two white female jurors.
At the behest of the trial court, East Baton Rouge Parish Deputy Sheriff Charles Duplantier was called to the stand and sworn as a witness. Duplantier testified that late during the day on the preceding Saturday, he escorted defendant from the courthouse to the jail facility across the street from the courthouse. When he rode the elevator with defendant down to the (ground floor) lobby of the courthouse, defendant was handcuffed and dressed in prison garb. Immediately upon stepping out of the elevator into the lobby, Duplantier noticed some people sitting to his right *393 on the south side of the lobby. When asked if these people saw defendant, Duplantier stated that he "[did not] see how they could have miss[ed]" defendant. However, Duplantier indicated that he did not look toward the people seated in the lobby. Thus, Duplantier did not even know if these people were three women; and, hence, he obviously could not identify them. Duplantier's attention had been focused on defendant whom he was escorting. Duplantier denied that he deliberately took defendant down the elevator so that jurors might have an occasion to view defendant. Duplantier indicated the encounter with whomever was seated in the lobby was unavoidable; and, upon the occurrence of the encounter, he quickened the pace of his escorting of defendant from the lobby to the jail facility across the street.
At the conclusion of Duplantier's testimony, the trial court asked the prosecutor and defense counsel if there was any objection to calling Ms. Spikes as a witness in regard to the three jurors' alleged viewing of defendant, noting that Spikes might be able to identify the other two jurors who were allegedly with her at the time in question. In response, defense counsel stated that (if the court was not going to grant the requested mistrial) she thought calling the three persons as witnesses "would only heighten the incident for those three jurors." Thereupon, the court observed that it was possible (though not probable) that three jurors sitting in the lobby might not have even looked up when defendant came out of the elevator with Duplantier; and the court took cognizance that, if any jurors were seated in the lobby and failed to pay attention or even recognize that it was defendant who was being escorted, defendant certainly would not have sustained any prejudice by the encounter. After noting that Ms. Spikes would probably recall who was present at any encounter in the lobby, the trial court made reference to defense counsel's statement that calling the jurors as witnesses might only heighten the incident and denied the motion for mistrial.
We find that the trial court did not abuse its discretion in refusing to grant defendant's motion for mistrial. The instant record does not even substantiate the occurrence of the alleged encounter between defendant and one or more jurors. Even assuming arguendo that the alleged encounter occurred, the scenario envisioned by defendant's allegation of one or perhaps as many as three jurors seeing defendant dressed in prison clothes and handcuffed (while defendant was being escorted by a deputy from the courthouse to jail during a recess of the trial) would not have so prejudiced defendant as to warrant relief on appeal. See State v. Wilkerson, 403 So.2d at 659. Mistrial is a drastic remedy and should be granted on a showing of substantial prejudice. There is no showing that defendant's presumption of innocence was destroyed or that any juror was influenced by seeing defendant in prison clothing and handcuffs. See State v. Burge, 486 So.2d 855, 866 (La.App. 1st Cir.), writ denied, 493 So.2d 1204 (La.1986).
This assignment lacks merit.
CONVICTION AND SENTENCE AFFIRMED.
SAVOIE, J., dissents and assigns reasons.
SAVOIE, Judge, dissenting.
As stated by the majority, the constitutional standard for testing the sufficiency of evidence, enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime charged and the defendant's identity as the perpetrator of that crime beyond a reasonable doubt. See State v. Moore, 477 So.2d 1231, 1233 (La.App. 1st Cir.1985), writs denied, 480 So.2d 739 and 480 So.2d 741 (La.1986). This standard is codified in LSA-C.Cr.P. art. 821. When circumstantial evidence is used to prove the commission of a crime, LSA-R.S. 15:438 provides that, assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable *394 hypothesis of innocence. Ultimately, all evidence, both direct and circumstantial, must be sufficient to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. State v. Rosiere, 488 So.2d 965, 968 (La.1986).
Viewing all of the evidence in the light most favorable to the state, the evidence amply proved beyond a reasonable doubt that one or more persons committed the (second degree) murder of Sheri Lynn Daigle. Thus, the question before us is not whether the evidence was legally sufficient to prove the essential elements of the charged offense of second degree murder itself but, rather, whether the evidence was legally sufficient to prove defendant (alone or with another) perpetrated this crime.[1] As noted by defendant, the evidence concerning the requisite element of his identity as the (a) perpetrator was entirely circumstantial. We now focus our attention on the evidence introduced at trial and the various inferences which may reasonably be drawn from that evidence as proof that defendant perpetrated the instant offense.
On the evening of May 5, Hood saw defendant and the victim engaging in a conversation. Hood did not hear what they were saying; but, when he later asked the victim what was the topic of the conversation, Hood alleges she told him that "[defendant] wanted to have sex with her, and she didn't want anything to do with [defendant]."[2] Pursuant to State v. Brown, 562 So.2d 868 (La.1990), Hood's recounting of the victim's disclosure of the subject matter of her conversation with defendant was admissible only to show that the victim was not sexually interested in defendant and to prove circumstantially her subsequent conduct, i.e., that (if defendant made sexual advances toward her) she would probably reject his sexual advances.
When the victim's body was removed from the septic tank, her blue jeans were found unzipped and pulled down to her pubic area. Testing of a vaginal swab from the victim failed to detect the presence of seminal fluid. Regarding the presence of a laceration and contusions to the victim's chin, detected during the autopsy, Dr. Suarez opined that these injuries might have been inflicted by a fist or blunt object; but the doctor also opined that these injuries could have been caused by placing the victim head first inside the septic tank. Nonetheless, while one reasonable inference that could be drawn from these circumstances is that one or more persons may have had sex or attempted to have sex with the victim an equally reasonable inference is that her jeans were pulled down by the manner in which she was placed in the tank.
According to Kimberly Cagle, on May 6, at about 6:00 or 6:30 p.m., defendant told her that he "needed to have a woman." While communication of a desire to another person (expressing the need for one of *395 the opposite sex) may not be a common occurrence, the desire itself surely does not reflect one uncommon to most adult members of our society. Nor does such a vague, oblique communication expressing a "[need] to have a woman" necessarily impart the wish or intention of the person (making the communication) to have sex or the desire or intention of that person, if the opportunity arises, to actually engage in sex.[3]
On the evening of May 6 between approximately 5:00-6:45 p.m., several witnesses either saw defendant talking to the victim in Spanish Town or saw the victim riding as a passenger in defendant's car with defendant driving the car in the Spanish Town area; and, at about 5:30-6:30 p.m. that day, Derrick M. Foxx saw the victim get into defendant's car with her hibachi at the Prescott Apartments. Subsequently, the victim's body was found in the septic tank behind the house at 10443 Siegen Lane, a location miles away from where the witnesses had last observed the victim on the preceding day. Other than Elgin Campbell's testimony concerning his sighting of a vehicle exiting the road leading to the Siegen Lane location at daybreak on May 7, there was no evidence even suggesting that defendant was seen by anyone at or near the Siegen Lane location after he was last seen with the victim. In regard to the car Campbell sighted, he stated that he saw only the basic outline of the vehicle. While the car Campbell sighted and defendant's car apparently both had faulty or noisy muffler systems, Campbell testified that he could not rule out the hypothesis that defendant's car was not the one he sighted on the morning of May 7; and, hence, Campbell's testimony was essentially inconclusive.
Dr. Suarez's expert opinion reflected that the victim's death occurred between approximately 7:00 p.m. on May 6 and 1:00 p.m. on May 7. During this time frame of about eighteen hours (which begins shortly after the approximate time testifying witnesses last saw defendant and the victim together), it was possible for anyone to have killed the victim. The circumstance of the victim's hibachi being found in the grass at the location where her body was discovered adds little, if anything, to the other circumstances; neither the hibachi nor any other particular object was ever established as the murder weapon.
An examination of the hibachi by the state's forensic expert (Charles Guarino) failed to reveal the presence of blood, human tissue or hair. His tests of the vaginal swab from the victim did not detect seminal fluid, and his examination of defendant's car also failed to reveal the presence of blood or seminal fluid. Accordingly, the failure to detect blood or seminal fluid in the car essentially rendered the evidence of the damp spot on the passenger seat of defendant's car useless evidence, in the absence of some other evidence of the nature of the dampness which might have linked the damp spot to the instant crime. Forensic scientist Jim Churchman compared the tires on defendant's car to the cast of the tire track impression found in the driveway to the location where the body was found. The rear left tire of defendant's vehicle was determined by Churchman as having the most similarities to the impression in the cast. While Churchman could not rule out the hypothesis that the impression was of the left rear tire of defendant's car, he could likewise not rule out the hypothesis that the impression was of some other tire. Hence, this evidence was essentially inconclusive.
The circumstances of the secluded nature of the location where the victim's body was found and defendant's prior knowledge of that location was relied upon heavily by the state. Yet, having such knowledge was certainly not exclusive to defendant or Brett Fontenot. Within about six to twenty-four *396 hours of the victim's death (as per Dr. Suarez's expert opinion), the victim's body was found by Fontenot and Johnson. An individual(s), with or without prior knowledge of that location, could have gone to the location with the victim or encountered her there; and, under any of these scenarios, the individual(s) could have killed the victim. Additionally, the state placed emphasis on defendant's prior knowledge of the location of the septic tanks. Even without prior knowledge of the location of the septic tanks, the victim's killer(s) could have surmised that a house in a secluded area far removed from other residences was probably equipped with a septic tank sewer system, or the killer(s) could have first located the septic tank (the covers of which were at ground surface level) in the highly overgrown area behind the house (without trampling the overgrowth) and then dragged the victim's body directly to the middle septic tank, thereby causing the pathway of trampled overgrowth which was found at the crime scene.
The state also relied on defendant's flight from his apartment on May 8 when Detectives Keller and Yarborough went there to talk to defendant, defendant's attempts to conceal his knowledge of the Siegen Lane location by asking Laura Cramer not to disclose to anyone that he possessed knowledge of the location, defendant's statement to Cramer (in reference to whether she had disclosed his knowledge of the location) that he "hoped she didn't `f' him over," defendant's lies (primarily relating to his claimed lack of knowledge of the Siegen Lane location), and the accompanying changes in defendant's physical demeanor during the taping of defendant's May 11 statement to Keller and Yarborough, which (according to Keller) changed from being calm and collected to defendant shaking and having his eyes "teared up" when he was confronted. While evidence such as that delineated above may raise an inference of a "guilty mind," it is not alone sufficient to convict. See State v. Shapiro, 431 So.2d 372, 388 (La.1983), on rehearing; State v. Savoy, 418 So.2d 547, 551 (La. 1982); State v. Guirlando, 491 So.2d 38, 41 n. 4 (La.App. 1st Cir.1986). While recognizing that there was evidence that prior to defendant's flight Scott Fisher had communicated to him that the officers wanted to talk to him in regard to their investigation of the murder of a girl, the convergence of these circumstances and the additional circumstances (evincing defendant's knowledge that he was being sought for a Texas parole violation, and his knowledge of Fisher's illicit drug transaction, including Fisher's return to their apartment with the illicit drugs shortly before the police came to defendant's apartment) severely muddles any indication of guilty knowledge stemming from defendant's flight from his apartment. In any event, notwithstanding any indication of a guilty mind flowing from any of the evidence referenced in this paragraph, I am convinced that under the Jackson v. Virginia standard the evidence in this case was legally insufficient to establish that defendant was the (a) perpetrator of the instant homicide. Cf. State v. Shapiro, on rehearing, 431 So.2d at 388; State v. Savoy, 418 So.2d at 551.
Objectively the state has proven only that: 1) the victim was last seen with defendant; and 2) the defendant was familiar with the location where the body was found and attempted to conceal this knowledge. These two facts, standing alone, do not in my humble opinion, constitute proof sufficient to convict. I do not find this matter to be a question of the rights of the defendant or the rights of the victim; rather it is a question of the application of the law to facts presented in the record. From those facts I must conclude that the state failed to prove the defendant's guilt beyond a reasonable doubt and to the exclusion of every reasonable hypothesis of innocence. Based upon all the evidence, both direct and circumstantial, and the reasonable competing inferences that may be drawn therefrom, I find that the evidence fails to exclude the reasonable hypothesis of innocence that the murder of Sheri Lynn Daigle was committed not by defendant but by one or more other persons. Thus, viewing the evidence in the light most favorable to the state, I find that a rational trier of fact *397 could not have concluded beyond a reasonable doubt and to the exclusion of every reasonable hypothesis of innocence that the state proved defendant perpetrated this offense.
For the above and foregoing reasons I respectfully dissent.
NOTES
[1] The record reveals that on May 7, 1987, Hughes was employed as an East Baton Rouge Parish Deputy Sheriff and that he went to 10443 Siegen Lane and worked there as a crime scene investigator.
[2] The record reveals that the excised versions were the result of the trial court's ruling that references to defendant having failed a polygraph test and certain references to drugs had to be deleted from the original tapes.
[3] In this case, as disclosed by the state's answer to defendant's motion for a bill of particulars, the state sought to prove second degree murder as defined in LSA-R.S. 14:30.1A(1), which defines second degree murder as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm.
[4] At trial, the state theorized that the defendant committed the murder between 7:00 and 9:00 p.m. on Wednesday, May 6, 1987, and that defendant returned to the scene of the crime to cover his tracks early on the morning of the following day.
[5] It was on the basis of the admission of the quoted testimony of Hood (concerning the subject matter of defendant's conversation with the victim) over defense counsel's hearsay objection that we reversed defendant's conviction and sentence in State v. Brown, 549 So.2d 323 (La.App. 1st Cir.1989), reversed, 562 So.2d 868 (La.1990). In reversing our decision, the Louisiana Supreme Court found this quoted testimony was admissible evidence to prove the victim's state of mind, and relevant to show the victim was not sexually interested in defendant and would have rejected his sexual advances. In reaching its decision, the Supreme Court stated that, to protect against any possible misapplication of the extrajudicial declaration of the victim, defendant should have requested a limiting instruction directing the jury to consider the declaration as evidence only of the victim's state of mind or of circumstantial proof of her subsequent conduct rather than the truthfulness of the assertion that defendant "wanted her;" however, the Supreme Court concluded that the omission of a limiting instruction was harmless in this case based on the "overwhelming evidence of Brown's guilt." 562 So.2d at 880-881. Consequently, in reviewing the sufficiency of the evidence, we may consider this evidence only in strict conformity with our Supreme Court's pronouncements in State v. Brown, 562 So.2d 868 (La.1990).
[6] We note that the portion of the extrajudicial declaration of the victim recounted through Hood's testimony that "[defendant] wanted to have sex with her" was found in State v. Brown, 562 So.2d at 880, to be inadmissible hearsay; and, thus, not evidence of the truthfulness of the statement. However, as noted by the Supreme Court "any improper inference the jury might have drawn from the declaration is overshadowed by defendant's statement to Cagle, evincing his subjective state of mind that he `needed to have a woman.'" 562 So.2d at 880.
[7] During the hearing on the motion in limine, (as evidence of the diligence exercised by defense counsel in trying to locate Jamie Gary) the state stipulated to the extensive unsuccessful efforts defense counsel had made to locate Jamie Gary and her mother.
[8] LSA-R.S. 44:3A(4) as amended by Acts 945 of 1984 and 785 of 1986, in effect and applicable in this case, provided as follows:

A. Nothing in this Chapter shall be construed to require disclosures of records, or the information contained therein, held by the offices of the attorney general, district attorneys, sheriffs, police departments, Department of Public Safety and Corrections, marshals, investigators, public health investigators, public health inspectors, or public health agencies, correctional agencies, or intelligence agencies of the state, which records are:
* * * * * *
(4) The records of the arrest of a person, other than the report of the officer or officers investigating a complaint, until a final judgment of conviction or the acceptance of a plea of guilty by a court of competent jurisdiction. However, the initial report of the officer or officers investigating a complaint, but not to apply to any followup or subsequent report or investigation, records of the booking of a person as provided in Louisiana Code of Criminal Procedure Article 228, records of the issuance of a summons or citation, and records of the filing of a bill of information shall be a public record.
[1] In this case, as disclosed by the state's answer to defendant's motion for a bill of particulars, the state sought to prove second degree murder as defined in LSA-R.S. 14:30.1A(1), which defines second degree murder as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm.
[2] It was on the basis of the admission of the quoted testimony of Hood (concerning the subject matter of defendant's conversation with the victim) over defense counsel's hearsay objection that we reversed defendant's conviction and sentence in State v. Brown, 549 So.2d 323 (La.App. 1st Cir.1989), reversed, 562 So.2d 868 (La.1990). In reversing our decision, the Louisiana Supreme Court found this quoted testimony was admissible evidence to prove the victim's state of mind, and relevant to show the victim was not sexually interested in defendant and would have rejected his sexual advances. In reaching its decision, the Supreme Court stated that, to protect against any possible misapplication of the extrajudicial declaration of the victim, defendant should have requested a limiting instruction directing the jury to consider the declaration as evidence only of the victim's state of mind or of circumstantial proof of her subsequent conduct rather than the truthfulness of the assertion that defendant "wanted her;" however, the Supreme Court concluded that the omission of a limiting instruction was harmless in this case. I cannot help but note, however, that the limited purpose of this highly inflammatory and prejudicial testimony was never explained to the jury. While I agree with the dissents of Justices Lemmon and Dennis in Brown, nonetheless, in reviewing the sufficiency of the evidence, I must consider this evidence only in strict conformity with our Supreme Court's majority pronouncements in State v. Brown, 562 So.2d 868 (La.1990).
[3] We note that the portion of the extrajudicial declaration of the victim recounted through Hood's testimony that "[defendant] wanted to have sex with her" was found in State v. Brown, 562 So.2d 868, 880 (La.1990), to be inadmissible hearsay; and, thus, not evidence of the truthfulness of the statement. Consequently, this testimony was not admissible to show defendant had a sexual interest in the victim; and, thus, it added nothing to defendant's statement to Cagle that he "needed to have a woman."