**Bruce Edwin CALLINS, Petitioner–Appellant,**

v.

**James A. COLLINS, Director, Texas Department of Criminal Justice, Institutional Division, Respondent–Appellee.**

No. 92–1699.

United States Court of Appeals, Fifth Circuit.

Aug. 6, 1993.

---

Danny D. Burns, Fort Worth, TX, for petitioner-appellant.

William C. Zapalac, Asst. Atty. Gen., Dan Morales, Atty. Gen., Austin, TX, for respondent-appellee.

Before HIGGINBOTHAM, SMITH, and DeMOSS, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Bruce Callins appeals the denial of his petition for writ of habeas corpus challenging his capital murder conviction. Finding no error in the findings of fact and conclusions of law of the district court, we affirm.

I.

On June 27, 1980, at approximately 4:00 p.m., Callins entered Norma's Lounge, a bar in Tarrant County, Texas, armed with a gun. There were three patrons and three employees present when he ordered the bartender to put money from the cash register into a bag. The remaining individuals were ordered to empty their pockets onto the bar or a pool table; Callins threatened to kill anyone who withheld property. Allen Huckleberry, a patron who was sitting at the bar, failed to turn over his wallet quickly enough to appease Callins, who shot him in the neck, ultimately causing him to bleed to death.[1]

II.

On August 19, 1980, Callins was indicted for one count of capital murder and six counts of aggravated robbery, and on October 15, 1981, the state filed a notice of intent to seek the death penalty. Prior to trial, the state dismissed three of the aggravated robbery charges; Callins pled not guilty to the remaining four counts.

On May 18, 1982, the jury convicted Callins of the capital offense and two counts of aggravated robbery. The next day, in a separate sentencing proceeding exclusively devoted to the aggravated robbery charges, the jury imposed a life sentence and a $10,-000 fine on each count. On May 20, an additional hearing was conducted to determine punishment for the capital murder charge. The jury affirmatively answered the Texas special issues, TEX.CODE CRIM.PROC. ANN. art. 37.071(b), and sentenced Callins to death.

On appeal to the Texas Court of Criminal Appeals, Callins's conviction initially was reversed for misjoinder, because state law prohibited the joinder of property offenses with offenses against persons. On a *sua sponte* motion for rehearing, however, the court reformed the judgment to delete the convictions for the two aggravated robbery offenses, thereby preserving the capital murder conviction and the death sentence. *Callins*, 780 S.W.2d at 185–96.

Callins failed timely to file a petition for writ of certiorari with the Supreme Court, and his initial execution date was set for May 9, 1990. Subsequently, he filed a certiorari petition and an application for writ of habeas corpus in the state trial court, which modified the execution date to June 20, 1990, reviewed the habeas application, entered findings of fact and conclusions of law, and recommend that relief be denied. The Court of Criminal Appeals denied relief on June 12, 1990. Callins then filed a habeas petition and application for stay of execution in federal court. The district court granted a stay of execution on June 12, 1990. On June 25, 1990, the Supreme Court denied Callins's petition for

---

1. A more detailed version of the facts of the instant case is set forth in the Texas Court of Criminal Appeals's decision. *See Callins v. State,* 780 S.W.2d 176, 179–80 (Tex.Crim.App.1986).

writ of certiorari. *Callins v. Texas*, 497 U.S. 1011, 110 S.Ct. 3256, 111 L.Ed.2d 766 (1990).

The magistrate judge issued findings of fact and conclusions of law on January 6, 1992, recommending that Callins be granted an evidentiary hearing on a number of issues in order to create an adequate record, despite the apparent lack of merit in his arguments. After the evidentiary hearing, the district court adopted the magistrate judge's findings and conclusions, entered additional findings and conclusions based upon the testimony presented at the hearing, denied relief, and dismissed the petition. Callins appeals following the district court's issuance of a certificate of probable cause.

### III.

■ Callins first asserts as error the denial of his Sixth Amendment Confrontation Clause rights allegedly inflicted by the trial court's refusal to allow him to impeach the testimony of Ricky Henderson, a witness for the state. Henderson had been working on a construction site when, approximately one-half hour after the robbery of Norma's Lounge, Callins pulled a gun on him, demanding he aid Callins in his escape attempt. Henderson took Callins to his supervisor, Arthur Wilson, who owned a jeep parked nearby. Callins then forced Wilson, at gunpoint, to drive him to another location. As the two men left in the jeep, Callins fired shots at Henderson and another worker.

The state sought to call Henderson at trial, to testify about the incident and identify Callins. Callins responded by filing a motion to suppress the identification, based upon the fact that Henderson was then on deferred adjudication probation for theft exceeding

$200. The court denied Callins's motion, ruling that he would not be allowed to impeach Henderson with his probationary status because it did not constitute a final conviction.[2]

Although the trial court's ruling was plainly correct as to Callins's attempt to impeach Henderson by evidence of his conviction of a crime under Tex.R.Crim.Evid. 609, Callins urges that his inability to elicit on cross-examination the possible motive for Henderson to alter his testimony in favor of the prosecution denied him the protection accorded him under the Confrontation Clause. As noted above, at the time of the trial, Henderson was serving a three-year deferred adjudication probation for theft. Callins contends that Henderson violated the terms of his probation by committing a misdemeanor criminal trespass on December 7, 1981, and the state's decision not to pursue a motion to revoke Henderson's probation constituted an implicit exchange for his testimony, evidence of which the jury was entitled to consider in assessing Henderson's credibility.

In *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986), the Court recognized that the foreclosure of all inquiry into a state witness's possible bias or motive, where the state had dropped pending criminal charges in exchange for favorable testimony, violated the defendant's rights secured by the Confrontation Clause. Unlike the situation in *Van Arsdall*, however, the uncontroverted evidence at both the trial and habeas proceedings, apparently accepted by Callins's trial counsel, was that no deal had been offered Henderson and no favorable action taken by the state district attorney on his behalf.[3] Testimony in federal district court, however,

---

2. *See Baehr v. State,* 615 S.W.2d 713, 716 (Tex. Crim.App.1981) (order of deferral not a finding of guilt), *overruled on other grounds, Elder v. State*, 677 S.W.2d 538, 539 (Tex.Crim.App.1984); *see also Martinez–Montoya v. Immigration & Naturalization Serv.*, 904 F.2d 1018, 1024–25 (5th Cir.1990) (deferred adjudication not a final conviction for purposes of deportation proceedings); *Green v. State*, 663 S.W.2d 145, 146 (Tex.App.— Houston [1st Dist.] 1983, pet. ref'd) (reversing murder conviction where defendant was impeached by his deferred adjudication probation for theft).

3. The Texas Court of Criminal Appeals rested its resolution of the issue on precisely this basis— that Callins "has not made any showing that witness Henderson testified against him as a result of bias, motive or ill will emanating from his status of deferred adjudication." *Callins*, 780 S.W.2d at 196. Although Henderson incurred a second post-probation misdemeanor charge on August 16, 1982, this transpired *after* his testimony at trial and thus is not relevant to any accusation of bias or motive to testify in favor of the government in exchange for dropping the charge.

revealed that there was frequent contact and substantial cooperation between the probation and district attorney's offices in investigating probation violations generally, as well as in determining whether a motion to revoke was warranted in an individual case.

We need not determine whether the evidence adduced before the district court was sufficient to permit a jury to infer that the prosecution dealt for Henderson's testimony, because we agree with the district court that even if the trial court erred in denying Callins the opportunity to impeach Henderson for bias, the error did not have "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, —— U.S. ——, ——, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). In the instant case, we must consider the weakness of Callins's allegations respecting Henderson's purported bias. Moreover, Henderson's testimony added little to the state's case. For the most part, it served to establish the facts leading up to the kidnapping of Arthur Wilson and his vehicle and lay a predicate for Wilson's identification of certain of the murder victim's items found in Callins's possession.

Henderson's identification of Callins was cumulative of, and corroborated by, the testimony of two workers who were on the construction site that day—Steven Henry and Paul Ethridge—both of whom also identified Callins in court. Lastly, Callins was identified by several witnesses at the murder scene, two of whom knew him from prior acquaintance. The strictly circumstantial allegations of Henderson's bias and the strength of the state's case as to Callins's guilt persuade us that, viewed in the context of the trial as a whole, any error the trial court may have committed in foreclosing Callins's opportunity to impeach Henderson had no effect on the verdict.

## IV.

■ Callins next asserts that the sentencing procedure violated the Fifth Amendment prohibition against double jeopardy. Here, the trial court fashioned a "tri-furcated" proceeding, with a single guilt/innocence phase and separate sentencing phases for the aggravated robbery and capital murder counts. This admittedly unusual process was made necessary because certain evidence required to be admitted at the capital punishment phase was inadmissible in the robbery sentencing phase. Callins argues that he was twice subjected to punishment for the same offense because the prosecutor told the jury to consider the murder in imposing an appropriate sentence on the two aggravated robbery counts.

■ Although the prohibition of double jeopardy includes subjection to multiple punishments for the same offense, *see Justices of Boston Mun. Court v. Lydon*, 466 U.S. 294, 308–09, 104 S.Ct. 1805, 1813–14, 80 L.Ed.2d 311 (1984), it does not offend the Fifth Amendment to sentence within the upper end of the permissible range for a crime on the basis of a defendant's other conduct. As we noted in *Sekou v. Blackburn*, 796 F.2d 108, 111–12 (5th Cir.1986), "[c]onsideration of criminal conduct as an aggravating circumstance does not convert the sentencing proceeding into a trial, conviction, or punishment for the criminal activity so considered." *See also United States v. Carey*, 943 F.2d 44, 46–47 & n. 4 (11th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1676, 118 L.Ed.2d 394 (1992). The Double Jeopardy Clause thus poses no bar to the jury's consideration of Callins's other conduct in determining an appropriate punishment for his aggravated robbery convictions.

■ Callins's related argument—that his due process rights were denied by permitting the jury to assess punishment first for the aggravated robbery convictions—is no more persuasive. Essentially, Callins contends that the jury was unaware that there were to be two separate sentencing proceedings, and thus the jury was left to believe that their only opportunity to punish Callins for the murder was in the robbery sentencing phase. At the capital murder sentencing phase, the jury was forced to select a death sentence, as it would have been illogical for them to impose no more severe a sentence for the more serious crime.

As the state makes plain in its brief, the record refutes Callins's claim. At the conclusion of the guilt/innocence phase, the court notified the jury of the bifurcated sentencing proceedings that were to follow. The extent and detail of the court's remarks leave little doubt that the jury understood that it was to assess punishment separately for the offenses. Given the trial court's explanation, the jury's imposition of the death penalty appears the product less of confusion than of that "reasoned *moral* response" required by the caselaw. *See, e.g., California v. Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring). Callins's due process rights were not infringed by the trifurcated nature of his trial.

### V.

Callins relies upon *Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (1989), for the proposition that "[t]he sentencer must be able to consider and give effect to [mitigating] evidence in imposing sentence." Specifically, Callins asserts that the Texas special issues did not allow him to present evidence of his troubled childhood and drug abuse and prevented the jury from giving full mitigating effect to the testimony that, after shooting Huckleberry, Callins reassured him that he would be all right and asked that someone call an ambulance after he left the bar.[4] It is well settled that no *Penry* claim can be asserted for evidence that could have been, but was not, introduced in the sentencing phase, *Lincecum v. Collins,* 958 F.2d 1271, 1282 (5th

Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992); *May v. Collins,* 904 F.2d 228, 232 (5th Cir.1990), *cert. denied,* 498 U.S. 1055, 111 S.Ct. 770, 112 L.Ed.2d 789 (1991), and we therefore do not consider Callins's allegations relating to his troubled childhood and drug use.[5]

As for the evidence of Callins's remorse toward, and consideration for, the murder victim, we note the Court of Criminal Appeals's conclusion that Callins "did nothing immediately after shooting the deceased to ameliorate the damage he caused"; his "off-hand remark" constituted "no more action than would have normally occurred in the aftermath of a shooting." *Callins,* 780 S.W.2d at 193. Nonetheless, Callins contends that, in the absence of an instruction defining the term "deliberately" for purposes of applying the first special issue, the jury could not give full mitigating effect to his conduct immediately after the shooting.

We disagree. Whatever marginal relevance Callins's conduct may have had toward the jury's consideration of the first two special issues, the jury was able fully to give it effect within the scope of the Texas special issues. Callins's conduct was relevant both to suggest that he did not deliberately shoot Huckleberry and that he therefore was not likely to be dangerous in the future. Unlike the situation in *Penry,* there was *no* aspect of this evidence that might compel an affirmative answer to one of the special issues; its only possible thrust was mitigating.

Here, as in the Supreme Court's recent treatment of the issue, "[Callins's] evidence

4. The Texas capital sentencing scheme, which guides juries in capital murder cases, reads in relevant part as follows:

 (b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

 (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

 (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

 (3) if raised by the evidence, whether the conduct of the defendant in killing the de-

ceased was unreasonable in response to the provocation, if any, by the deceased.

 (c) The state must prove each issue submitted beyond a reasonable doubt, and the jury shall return a special verdict of "yes" or "no" on each issue submitted.

TEX.CODE CRIM.P. art. 37.071 (Vernon 1990).

5. We note in passing, however, that we have previously held that just these two issues—a capital murder defendant's troubled childhood and drug abuse (alcohol)—do not raise *Penry* claims, at least where the evidence of these traits adduced at trial was meager. *See Drew v. Collins,* 964 F.2d 411, 420 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 3044, 125 L.Ed.2d 730 (1993).

quite readily could have supported a negative answer. This distinction leads us to conclude that neither *Penry* nor any of its predecessors '*dictates*' the relief [petitioner] seeks...." *Graham v. Collins,* —— U.S. ——, ——, 113 S.Ct. 892, 902, 122 L.Ed.2d 260 (1993) (emphasis in original); *see also Johnson v. Texas,* —— U.S. ——, ——, 113 S.Ct. 2658, 2668–70, 125 L.Ed.2d 290 (1993) (no *Penry* instruction required where jury "had a meaningful basis to consider the relevant mitigating qualities of petitioner's youth"). Any other application of *Penry* to the instant case would result in precisely the new rule of constitutional law that, in *Graham,* the Court found foreclosed by *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

■■■ In a related argument, Callins challenges the sufficiency of the evidence to support the jury's affirmative finding as to the first special issue—whether his conduct was committed deliberately and with the legitimate expectation that the death of the victim would result. In reviewing a claim of insufficiency, we examine all the evidence in the light most favorable to the verdict and ask whether any rational trier of fact could have found the issue in controversy to have been proven beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 317, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979). Where a state appellate court has conducted a thoughtful review of the evidence, moreover, its determination is entitled to great deference. *Parker v. Procunier,* 763 F.2d 665, 666 (5th Cir.), *cert. denied,* 474 U.S. 855, 106 S.Ct. 159, 88 L.Ed.2d 132 (1985).

The Court of Criminal Appeals adequately addressed this issue:

> Appellant [Callins] entered a bar with a loaded firearm, began to rob the occupants and announced his intention of shooting anyone who held anything back. Appellant then decided that Allen Huckleberry was moving too slowly and shot him in the neck at close range. *There was no evidence that the deceased had provoked the attack in any manner.*

*Callins,* 780 S.W.2d at 181 (emphasis added). The court found ample evidence from which a rational trier of fact could have concluded that Callins's conduct was deliberate. Only Kathy Harmon and Frank Houx testified that they saw the victim both immediately before and after the shot (although neither actually witnessed the shooting); both testified that Huckleberry neither said nor did anything that might have provoked Callins.

According to Houx, Huckleberry dropped his billfold on the ground and fumbled for it, "as if he was trying to maybe keep it from being stolen in the course of the robbery." It was shortly thereafter that Callins shot him. The evidence was more than sufficient to support the jury's affirmative answer to the first special issue; the jury's refusal to credit, in this regard, Callins's contention that he reassured the victim and requested medical assistance does not render his conviction suspect.

## VI.

■■■ Callins alleges as error the introduction of several extraneous offenses: the kidnapping and assault of Arthur Wilson, the murder threat against Rickey Henderson, and the firing of a shot at Paul Ethridge and Stephen Henry. In addition, the testimony of Horace and Bill Jones was introduced over Callins's objection to show his flight from arrest. Callins contends that the introduction of such evidence relieved the state of its burden to prove beyond a reasonable doubt that the answer to the second special issue—future dangerousness—should be in the affirmative.

This argument is meritless. We previously have held that the presentation of unadjudicated extraneous offenses at the sentencing phase of Texas capital murder trials does not implicate constitutional concerns. *Williams v. Lynaugh,* 814 F.2d 205, 207–08 (5th Cir.), *cert. denied,* 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 270 (1987); *Milton v. Procunier,* 744 F.2d 1091, 1097 (5th Cir.1984), *cert. denied,* 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985). These concerns, as we have stated, are best "addressed by properly applied standards of relevance and sufficiency of proof." *Id.* The evidence of Callins's uncharged offenses was plainly relevant for the determination of his future dangerousness;

the court did not err in allowing it to reach the jury.

## VII.

■ Callins next asserts that he was denied due process of law by the trial court's denial of a mistrial based upon the jury's exposure to one venireman's racist remarks and by the court's refusal to allow his challenge for cause to another venireman based upon his alleged racial bias. During voir dire, venireman Johnny Frank Pruitt was asked whether he had heard any other veniremen discussing the case; he replied that one member, Robert Max Cannon, had referred to Callins as a "nigger" and had speculated as to how he could afford to pay for his attorneys. Callins moved for a mistrial and, alternatively, to quash the jury panel; the court denied both motions.

■ To prevail on a due process claim that he was denied a fair trial owing to contamination of the panel by exposure to prejudicial information, a petitioner must demonstrate prejudice, i.e., "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." *Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975). Here, the trial court *sua sponte* awarded Callins an additional peremptory strike because he had been forced to expend one on Cannon before his remark was made known to him. As for Pruitt, Callins appears to have been satisfied that he could render an impartial verdict; after questioning by Callins's counsel, he was accepted and served as a juror. Counsel's interrogation of other veniremen who might have been exposed to Cannon's remark revealed that they had heard nothing that would prevent their sitting on the jury. Callins has failed to demonstrate prejudice from Cannon's racist remark; the district court did not err in denying relief on this ground.

■ Callins also alleges that during voir dire, venireman Luis Thomas Duran demonstrated prejudice against blacks, yet the trial court denied his challenge for cause, forcing him to expend a peremptory strike. While

Callins claims that Duran expressed a view that blacks are more likely to commit aggravated robbery and murder than are members of other races, that was not the basis of his challenge to Duran at trial. Rather, Callins objected to Duran's apparent preference for harsh sentences.[6]

Additionally, Callins cannot demonstrate the requisite prejudice; although he accurately states that he did not receive an additional strike to replace that used against Duran, the record reveals that after exhausting his strikes, he asked for and received an additional peremptory strike, which he immediately used against venireman John Joseph Nelson. Callins thereafter requested no additional peremptory strikes, nor did he object to the jury or to any juror ultimately seated. Callins was not denied due process by the court's refusal to allow his challenge for cause to Duran.

## VIII.

Finally, Callins claims that he received ineffective assistance from his trial counsel, thereby depriving him of the right to counsel guaranteed him under the Sixth Amendment. Callins's complaint is three-pronged: the trial court rendered counsel's assistance ineffective by permitting voir dire to proceed under the assumption that the jury would decide on only one sentence rather than the bifurcated sentencing procedure actually followed; counsel failed to offer at trial the only possible affirmative defense available to Callins, self-defense; and counsel was unfamiliar with the law regarding mitigating evidence admissible in the capital sentencing phase and failed adequately to investigate and adduce such mitigating testimony from Callins's family members and friends.

■ In order to prevail on a claim of ineffective assistance of counsel, a habeas petitioner must meet the two-prong test of *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2063–64, 80 L.Ed.2d 674 (1984): that counsel's performance was deficient and that such deficient performance prejudiced the defense. As *Strickland* cau-

---

6. See *Callins,* 780 S.W.2d at 187, for the transcript of Duran's testimony.

tions us, *our scrutiny of counsel's performance must be highly deferential, lest it suffer "the distorting effects of hindsight."* *Id.* at 689, 104 S.Ct. at 2065. We must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and that a challenged action " 'might be considered sound trial strategy.' " *Id.* (citation omitted).

In reviewing for prejudice, we must look for "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. When a defendant challenges the imposition of the death sentence, our inquiry must be "whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695, 104 S.Ct. at 2069.

 We conclude that Callins's assertion that he would have structured his voir dire differently had he been aware of the trifurcated procedure ultimately devised by the trial court is, at best, highly speculative. Indeed, before the district court, Callins's trial counsel could only "wonder[ ] whether I would have done something different" had he known beforehand of the trifurcated process. Nor can we perceive, without considerably more, a reasonable probability that a jury selected with the trifurcated process in mind would have reached a different result, given the overwhelming evidence of guilt and the relatively meager mitigating evidence presented during the capital sentencing phase.

 Callins's contention that his counsel was negligent in failing to raise the defense of self-defense is nothing short of ludicrous in light of common sense and long-standing Texas precedent. In short, as the Court of Criminal Appeals has stated, "we note that a robber has no right of self-defense against his victim. This is especially true when the victim is justified in acting to recover his property, prevent the offense or save another person." *Westley v. State,* 754 S.W.2d 224, 230 (Tex.Crim.App.1988), *cert. denied,* 492 U.S. 911, 109 S.Ct. 3229, 106 L.Ed.2d 577 (1989). *See also Jones v. State,* 149 Tex. Crim. 441, 195 S.W.2d 349, 353 (1946). Even

were this not the case, Callins failed to introduce any evidence of Huckleberry's provocative actions; indeed, the evidence was uncontroverted that the deceased committed no aggressive act.

 Lastly, Callins argues that his trial counsel was unaware of the wide range of mitigating evidence that could be presented at the capital sentencing phase and therefore failed to conduct a reasonable investigation into such evidence. Specifically, Callins asserts that evidence of his good character and drug use—potentially relevant to the resolution of the first and the first and second special issues, respectively—was not looked into because his counsel was not aware that it was admissible.

The evidence adduced at the hearing before the district court, however, fails to support Callins's view of his counsel's knowledge. Callins's mother, for example, was called at the punishment phase to testify to her son's good character; obviously, counsel must have believed that such testimony properly could be admitted at that time. Additionally, trial counsel for Callins testified that he recalled asking Callins's mother and brother for names of other people who might testify on Callins's behalf. Although Mrs. Callins claimed never to have spoken with the attorneys about such matters, she conceded on cross that Callins himself had mentioned to her the need to acquire mitigating evidence.

Even if counsel's performance in this regard was to be considered deficient, Callins can show no prejudice. The evidence of his drug use, although relevant to the punishment issues, cuts both ways; indeed, in light of the absence of any evidence that Callins was under the influence of drugs at the time of his offense, the evidence of past drug use would appear to be more aggravating than mitigating.

Also, the fact that Callins had not committed a felony previously, combined with "some evidence of employment," according to his trial counsel, does not give rise to a reasonable probability that a rational jury would have answered one of the special issues in the negative, resulting in a life sentence.

Some evidence of Callins's good character already had been admitted through his mother; the wantonness of the murder and Callins's violent escapades after it, however, swamped this evidence, and we believe it equally would have overwhelmed the minimal mitigating evidence that Callins now argues should have been introduced at the capital sentencing phase.

Therefore, we AFFIRM the judgment of the district court.