IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-31155
_____


GEORGE B BROWN

                                    Petitioner - Appellant

        v.

BURL CAIN, Warden, Louisiana State Penitentiary

                                    Respondent - Appellee

_____

             Appeal from the United States District Court
                  for the Middle District of Louisiana
                              (97-CV-12)
_____
                            May 31, 2000

Before KING, Chief Judge, and GARWOOD and DeMOSS, Circuit Judges.

PER CURIAM:[*]

     Petitioner-Appellant appeals from the district court's

denial of his petition for a writ of habeas corpus pursuant to 28

U.S.C. § 2254.  This court granted a certificate of appealability

on the sole issue of whether the evidence was sufficient to

sustain Petitioner-Appellant's conviction for second-degree

_____

     [*] Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

murder in Louisiana state court.  For the reasons stated below, we AFFIRM the district court's decision.

## I.FACTUAL AND PROCEDURAL HISTORY

On the evening of May 7, 1987, Brett Fontenot and Randall Johnson discovered Sheri Lynn Daigle's ("Daigle") body partially submerged in a septic tank some distance behind an abandoned house at 10443 Siegen Lane.  The police subsequently arrested Petitioner George B. Brown ("Brown") for Daigle's murder.  Brown was indicted for second-degree murder by an East Baton Rouge Parish grand jury.  See State v. Brown, 549 So.2d 323, 324 (La. Ct. App. 1989) ("Brown I"), rev'd by 562 So.2d 868 (La. 1990).  Brown entered a plea of not guilty, and the case went to trial. See id.

### A.   Evidence Adduced at Trial

Because Brown challenges the sufficiency of the evidence, we summarize it here.

### 1.  Acquaintance with the Victim

Several witnesses testified that they saw Brown talking to Daigle at the apartment complex at 609 Spanish Town Road in Baton Rouge, Louisiana at about 5:30 p.m. on May 6, 1987.  Michael Hood, with whom Daigle had been staying for the past two days, testified that he asked Daigle if she would get her hibachi grill so that Hood could barbecue some chicken for dinner.  Daigle replied in the affirmative.  Hood did not see Daigle leave.  Hood

2

remained in his apartment for the rest of the evening with friends, but he did not see Daigle again after that conversation. Hood, whose relationship with Daigle had a sexual aspect, also testified that he had seen Daigle speaking with Brown the previous day. When Hood asked Daigle what Brown had said to her, she replied that Brown wanted to have sex with her but that she wanted nothing to do with Brown.[1]

Brown and Daigle were also seen by Kimberly Cagle, Brown's next door neighbor in the apartments at 605 Spanish Town Road.[2] Cagle testified that she had spoken to Brown at their apartment complex about an hour and a half before she saw him at the 609 Spanish Town Road apartments. She had asked him at that time how he was doing, and he replied that he "needed a woman." Brown also told her that he had broken up with his girlfriend. Brown seemed restless, but not violent or agitated.

Deputy Sheriff Derrick M. Foxx testified that he saw Daigle and Brown at the Prescott Place Apartments, sometime between 5:30 and 6:30 p.m.[3] Brown was seated in a parked car in the parking

---

[1] This hearsay statement was the basis for the Louisiana First Circuit Court of Appeal's decision to overturn Brown's conviction in Brown I.

[2] Brown and Daigle were also seen by Jacqueline Haydel, a neighbor of Hood's, around 5:30 p.m.

[3] Until May 4, Daigle had been living at this apartment complex with Paul Beatty.

lot of the apartment complex.[4]  He moved his car because he was blocking Foxx's parking space, and he told Foxx that he was waiting for Daigle.  Foxx then saw Daigle descending a stairwell, carrying a hibachi grill.  She was wearing a red tank top and blue jeans.  Daigle put the grill in the back seat of Brown's car, and then got in the front seat.  According to Foxx, she did not seem frightened, and Brown seemed neither nervous nor evasive.  Foxx watched them drive out of the parking lot.

Vince Fender and Robin Holt, who were acquainted with both Daigle and Brown, saw Brown and Daigle driving just before 7 p.m.[5]  Daigle did not appear frightened, and in fact waved at Fender and Holt, who were sitting with some other friends on Holt's porch, as the car passed.  They did not see Brown drive back along the same road, or see Daigle again after that.

*2.  Familiarity with the Crime Scene*

Roy Skiba testified that he had previously resided at 10443 Siegen Lane ("Siegen Lane house") with his sister, Dawn Harding, their mother, and another brother.  He stated that the house was not visible from Siegen Lane.  He also said that Brown had been romantically involved with Harding during the time that he lived

---

[4]  Foxx stated that Brown was driving a Ford Grand Torino, but identified the car in the state's exhibits, Brown's 1974 Mercury Montego, as the car he had seen Brown driving on May 6.

[5]  Fender testified that the car was driving in the opposite direction from Brown's apartment complex.

4

at the Siegen Lane house.[6]  During that time, Brown visited
Harding at the house every few days.  Brown generally stayed at
the house for a few hours at a time or overnight.  Brown stopped
coming to the house when he and Harding moved into an apartment
together.  Skiba also testified that Brown knew where the septic
tanks were located at the Siegen Lane house, and had actually
once attempted to fix a clogged line.

Laura Cramer, who stated that she had an "on-again, off-
again relationship" with Brown, testified that she had both
dropped Brown off and picked him up at the Siegen Lane house
around August or September 1986.  Brown had also once given
Cramer's father directions to the Siegen Lane house.

### 3.  Presence at the Crime Scene

Elgin Campbell testified that he saw a car driving away from
the Siegen Lane house in the early morning hours of May 7.
Campbell, who lives across the street from the Siegen Lane house,
was standing at the end of his driveway.  It was not yet light
outside, and the car's headlights were off.  However, he could
distinguish the general outline of the car, which had a long hood
and distinctive trunk.  Campbell, who was familiar with cars,
identified the car as a 1977 or 1978 model, and as either a
Cougar or a Montego.  He noticed that the car was loud, and

---

[6]  Skiba was uncertain about when the relationship occurred,
but he stated that Brown's visits took place some time after
January 1986.  Brown was apparently incarcerated in Texas until
the summer of 1986, however.

surmised that the noise was caused by a faulty muffler or exhaust system.

Once Brown's car had been taken to the police crime lab, Campbell identified it as the car he had seen on the morning of May 7 at Siegen Lane. Campbell also examined the underside of the car muffler, and concluded that it had a "bad" exhaust system. However, Campbell never heard the car run, and thus could not compare the sound of Brown's car to that of the car he had seen in Siegen Lane.

### 4. Physical Evidence

The individuals who discovered Daigle's body, Fontenot and Johnson, testified that they were looking for redwood planks on the evening of May 7. On Fontenot's suggestion, they ventured onto the land surrounding the abandoned Siegen Lane house, which is heavily wooded and surrounded by a tall wooden fence. They noticed a trail through the overgrown weeds behind the house. When they proceeded along this trail, they came upon a pool of fresh-looking liquid blood about eight to twelve inches in diameter. The trail led to three septic tanks. Fontenot noticed that the lid of the middle septic tank was ajar. When he removed the lid, he observed Daigle's feet protruding from the water inside the septic tank. Fontenot and Johnson left the area, went to a nearby fire station, and called for help.[7]

---

[7] The East Baton Rouge Sheriff's Department undertook the investigation.

Deputy Sheriff Randy Walker testified that he answered the call, and accompanied Johnson and Fontenot to the crime scene. He stated that the trail that led to the septic tanks appeared to have had something dragged along it, and looked fresh. The ground was damp, and the puddle of blood was liquid and darker in the center.[8] Deputy Walker noticed a fresh tire track on the gravel road that led from the Siegen Lane house to the main road, which resembled a car tire rather than a truck tire, and roped the area off with evidence tape. He also noticed several items of clothing, including a pair of blue men's shorts, and two bath towels. Deputy John Maranto testified that he and other deputies took photographs of the crime scene, made a cast of the tire track, and collected the clothes and towels. Other deputies testified that a hibachi grill was found in the weeds, some distance from the septic tanks, on May 11. The hibachi was later identified as the grill owned by Paul Beatty and taken from Beatty's apartment by Daigle on the evening of May 6.

Lt. Randy Keller testified that he and Chuck Smith, the deputy coroner, extracted Daigle's body from the septic tank. Smith estimated that the water in the septic tank was about 70 degrees, and that the body had stiffened. The body was clad in a red tank top and blue jeans, but the blue jeans were unzipped and pulled down to expose the pubic area. Lt. Keller found two

---

[8]  Lt. Randy Keller and Deputy Coroner Chuck Smith confirmed this description of the trail and the blood.

7

pieces of paper in the left front pocket of Daigle's jeans.  A phone number was written on one of the pieces of paper.  He and the other detectives then left the crime scene to begin their investigation.

Dr. Alfredo Suarez, the coroner, testified regarding the results of the autopsy he performed on Daigle's body.  Suarez testified that the cause of death was inhalation of septic tank fluid.  He found eight lacerations on the top of the head, which corresponded to multiple skull fractures and bleeding sufficient to have caused death.  Suarez stated that the wounds would have bled profusely, but would not have gushed or spurted blood.  He found another laceration and multiple contusions on Daigle's chin, which appeared to have been caused by a blunt instrument about the size of a fist.  Suarez conceded, however, that the injuries to Daigle's chin could have occurred when she was placed head-first in the septic tank.  Suarez examined the contents of Daigle's stomach, and detected only 30 cc's or so of an unidentifiable brownish liquid.[9]  Smith, assisting Suarez, later removed several small metal glitter-like flakes from Daigle's head wounds.

Based on photographs showing the degree of rigor mortis at the time the body was found, Suarez estimated that Daigle had died between six and twenty-four hours, but probably closer to

---

[9]  Suarez stated that it generally takes about 30 minutes for liquid to be completely absorbed by the stomach.

twenty-four hours, prior to her body being found. He also stated that the skin on Daigle's hands was wrinkled from having been in the septic tank fluid for some period of time. Finally, regarding the puddle of blood found at the crime scene, Suarez testified that blood would probably appear fresh if it lay in a humid, moist area, even if it had been there for some time.

Charles Guarino, a forensic serologist, testified that he tested a vaginal swab taken from Daigle's body, but detected no seminal fluid. Guarino also checked for blood, tissue, or fibers under Daigle's nails but found none that incriminated Brown. Guarino later tested the interior of Brown's car, as well as the clothes and tools found in the trunk, for blood and semen stains but found neither. A stain on the passenger's seat, said by Scott Fisher, Brown's roommate, to have been liquid on the night of May 6, was not found to consist of either blood or semen. No weapon consistent with Daigle's head wounds was found in the car. Furthermore, Guarino specifically searched the interior of the car for metal flakes similar to those found in Daigle's head wounds, but found none.

Guarino also testified that he tested some articles of clothing taken from Brown's apartment. There was a bloodstain on one of Brown's T-shirts, but the stain was so faded that a blood type could not be ascertained. The towels and clothing taken from the crime scene were also tested, but were neither identified as Brown's nor found to contain blood or semen stains.

9

Furthermore, no blood, tissue, or fingerprints were detected on the hibachi.

In addition, Jim Churchman, a Louisiana State Police Crime Laboratory forensic scientist, testified that one tire on Brown's car was virtually identical to the tire that left the track at the crime scene. He compared the tires on Brown's car to the cast of the track left at the Siegen Lane house. He found that the tread design of the back left tire was identical to the tire that made the cast. The tire was almost worn out, as was the tire that made the cast. Churchman found no technical difference between the general size, shape, and pattern of the tire that made the cast and the left rear tire. However, he could not find the exact segment of Brown's tire that made the track shown in the cast.

### 5. *Brown's Demeanor*

Lt. Keller testified that he and the other detectives went to Brown's apartment looking for Brown during the early morning hours of May 8. Brown's roommate, Scott Fisher, denied knowing Brown, and the detectives left.[10] They returned some time later, and informed Fisher that they were investigating the homicide of Sheri Lynn Daigle. When they left for a second time, Fisher told Brown what the detectives had said. Fisher testified that he and

---

[10] Fisher testified that he panicked because he had just returned from a bar where he had purchased cocaine. He had borrowed Brown's car to make the purchase.

Brown panicked, and that Brown began acting "like a caged animal."  Brown explained that he had had trouble with a female probation officer.  The officers knocked a third time, and asked Fisher to come outside and identify Brown's car.  When Fisher returned to the apartment, his bedroom window was open and Brown was not in the apartment.

Lt. Keller also testified that, at about 10:30 p.m. on May 8, Brown went voluntarily to the Sheriff Department's detective bureau.  After being advised of his rights, Brown made an oral statement.[11]  Lt. Keller testified that Brown made a series of false statements in the course of the questioning that ensued. First, Brown stated that Michael Hood and Daigle had argued, and thus that Hood, not Brown, must have killed her.  Brown admitted that he had taken Daigle to collect the hibachi grill, and said that he and Daigle went back to Brown's apartment after the grill was retrieved.  Brown said that Hood was waiting outside Brown's apartment, that the three of them went inside, and that Hood and Daigle subsequently argued about whether Hood was the father of Daigle's child before Hood and Daigle left together in Brown's car.[12]  When Lt. Keller informed Brown that Hood had been

_____

[11]  Brown was arrested for Texas parole violations at 7 a.m. on May 9.  He remained in custody, and subsequently made a taped statement on May 11.  At the conclusion of his taped statement, he was arrested for Daigle's murder.

[12]  Lt. Keller brought Hood into the detective bureau to confront Brown during the early morning of May 9.  Upon seeing Hood, Brown jumped up and asked why Hood had killed Daigle.

11

incarcerated at the time the child was conceived, Brown changed his story to indicate that the argument "might have been" about the paternity of Daigle's child. In Brown's later taped statement, he claimed that he knew that Hood could not have been the father of Daigle's child, and instead maintained that the argument between Hood and Daigle concerned Hood's wanting the baby.

Next, Brown denied that he was familiar with the Siegen Lane house. Lt. Keller stated that he asked Brown about the Siegen Lane house during the initial interrogation on the evening of May 8. He told Brown that the body had been discovered at 10443 Siegen Lane Road, at an abandoned house set back from the main road by a gravel and dirt road, in a culvert located in a heavily weeded area behind the house. He then asked if Brown was familiar with the location where the body had been found. Brown stated that he knew about the location from having seen it on the news, but completely denied that he personally knew the house or was familiar with the area. On May 11, Brown was shown photographs of the Siegen Lane house and its environs. However, Brown continued to deny that he had ever seen the location depicted in each specific photograph. He eventually admitted that he knew Dawn Harding, and that he had visited the Siegen Lane house with Laura Cramer while they were dating.

_____

Hood, with equal vehemence, denied having done so and called Brown a liar.

12

Lt. Keller also testified that Brown's demeanor changed when he was confronted with evidence that Brown had been at the Siegen Lane house. On May 11, during Brown's taped statement, Lt. Keller showed Brown photographs of the Siegen Lane house. Brown became extremely agitated. He began shaking, and his eyes began tearing up. On cross-examination, Lt. Keller conceded that he had taken a more hostile tone with Brown at this point in the interview because he thought Brown was lying to him.

Laura Cramer also testified that Brown called her and tried to prevent her from telling the police that he was familiar with the Siegen Lane house. On the morning of May 9, Brown called Cramer and asked her if she had heard about Daigle's murder. When she said that she had, he asked her not to tell anyone that she had been at the crime scene or knew where it was. Brown called Cramer again later that day, and said that he hoped she would not "f" him over. During the days that followed, Brown called her repeatedly, both at work and at home, until Cramer changed her home phone number.

### 6. Alibi

Fisher testified as to Brown's whereabouts between 9 p.m. and 7 a.m. on May 6. Brown and Daigle came into the Capital Grocery Store (where Fisher worked) around 5:30 or 6 p.m. Fisher next saw Brown at about 9:05 p.m., when Fisher came home from work. Fisher and Brown went to play pool at about 10 p.m., and

13

did not return to the apartment until 12:30 or 1 a.m.  Fisher did

not hear Brown leave the apartment between 1 a.m. and 7 a.m. the

next morning.  At 7:30 a.m., Brown telephoned his employer,

Salvador Saia.  Saia returned the call at around 8 a.m.  Brown

went to work, where he remained all day.[13]

B.  Procedural History

On the basis of the evidence described above, Brown was

convicted of second-degree murder.  See Brown I, 594 So.2d at

324.  He was sentenced to the mandatory term of life imprisonment

at hard labor without benefit of probation, parole, or suspension

of sentence.  See id.  Brown appealed his sentence, enumerating

thirteen assignments of error (but abandoning five).  See id.

The Louisiana First Circuit Court of Appeal found that the trial

court had committed reversible error by admitting a hearsay

statement by Michael Hood.  Without the statement, the court

ruled, "the state's case for the otherwise apparently motiveless

killing of the victim depended entirely upon inferences from the

trier of fact from circumstantial evidence."  Id. at 326.  The

Court of Appeal reversed Brown's conviction and sentence, and

remanded the case to the trial court.  See id.

---

[13]  At trial, Brown unsuccessfully tried to introduce
hearsay evidence indicating that a young girl, Jamie Gary, had
seen Daigle on the afternoon of May 7.  The State was unable to
locate Jamie Gary, and the police, who had interviewed her, were
convinced that she was confused and had actually seen Daigle on
the afternoon of May 6.

14

The Louisiana Supreme Court reversed the Court of Appeal's decision, reinstated Brown's conviction and sentence, and remanded the case to the Court of Appeal for consideration of the remaining assignments of error. See State v. Brown, 562 So.2d 868 (La. 1990) ("Brown II"). On remand, the Court of Appeal determined that the remaining assignments of error, including a sufficiency of the evidence claim, lacked merit, and affirmed the conviction and sentence. See State v. Brown, 594 So.2d 372 (La. Ct. App. 1991) ("Brown III"). One court of appeals judge dissented, finding that the evidence was insufficient to sustain the verdict. See Brown III, 594 So.2d at 393-97. Brown applied for review in the Louisiana Supreme Court, which was denied. See State v. Brown, 596 So.2d 552 (La. 1992) ("Brown IV").

On January 6, 1997, Brown timely filed a petition for a writ of habeas corpus in the United States District Court for the Middle District of Louisiana under 28 U.S.C. § 2254. In his petiton, he raised four issues, including sufficiency of the evidence. Adopting the magistrate judge's report and recommendation over Brown's written objections, the district court entered a judgment dismissing Brown's petition. On June 2, 1999, this court granted Brown a certificate of appealability on the issue of the sufficiency of the evidence. This appeal ensued.

## II.  DISCUSSION

15

Brown argues that (1) the prosecution failed to prove a time of death or produce a weapon, (2) the evidence that his car was present at the crime scene was inconclusive, (3) there was evidence that he was in his apartment at the time his car was allegedly seen at the crime scene, (4) Brett Fontenot was equally familiar with the Siegen Lane house and acted suspiciously, (5) his agitation during the taped statement could be explained by Lt. Keller's hostile interrogative style, and (6) evidence that he asked Laura Cramer to conceal his familiarity with the Siegen Lane location is insufficient to support an inference of guilt. Thus, Brown contends, the Court of Appeal unreasonably applied the Jackson standard in determining that the evidence adduced at his trial was sufficient to sustain the jury's verdict of second-degree murder.  We disagree.

A.   Standard of Review

Brown's petition for habeas review was filed after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA").  Consequently, the AEDPA governs our review of his petition.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997).

As an initial matter, the AEDPA requires that a state court have adjudicated the claim on the merits.  See 28 U.S.C. § 2254(d).  Here, after the Louisiana Supreme Court remanded the appeal to the Louisiana Court of Appeal in Brown II, the latter court determined that the evidence was sufficient to sustain

16

Brown's conviction. See Brown III, 594 So.2d at 384-87. The Court of Appeal's decision on direct appeal constitutes an "adjudication on the merits." See Jackson v. State, 112 F.3d 823, 824-25 (5th Cir.), cert. denied, 522 U.S. 1119 (1998).

Under the AEDPA's statutory scheme, we review pure questions of law and mixed questions of law and fact under § 2254(d)(1), and questions of fact under § 2254(d)(2). See § 2254(d).[14] This court has applied § 2254(d)(1) when reviewing the constitutional sufficiency of the evidence supporting a state court's ruling. See Hughes v. Johnson, 191 F.3d 607, 620, 621 (5th Cir.), cert. denied, 120 S.Ct. 1003 (2000).

Our review of a state-court decision under § 2254(d)(1) is extremely limited. We are bound to uphold such a decision unless we find that it was "contrary to, or involved an unreasonable application of, established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A decision is contrary to clearly established Federal law if the state court (1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law;" or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [an opposite result]." Williams v. Taylor, 2000 WL 385369, at *23 (U.S.). A decision

_____

[14] Factual findings are presumed to be correct unless the petitioner shows by clear and convincing evidence that they were unreasonably determined "in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

17

involves an unreasonable application of clearly established Federal law if the state court (1) "identifies the the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case;" or (2) "either unreasonably extends a legal principle from our precedent to a new context . . . or unreasonably refuses to extend that principle to a new context where it should apply."  Id. at *25 (citation omitted). Furthermore, a federal court may not issue a habeas writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  Id. at *27.

Here, Brown seeks to apply the clearly established Jackson v. Virginia standard for determining the constitutional sufficiency of the evidence on federal habeas review.  See Jackson v. Virginia, 443 U.S. 307 (1979).  The Court of Appeal specifically applied this standard in reviewing Brown's sufficiency claim in Brown III.  See Brown III, 594 So.2d at 384. Thus, the question before us is whether its application of the Jackson v. Virginia standard was objectively unreasonable.  See Williams, 2000 WL 385369, at *24.

### B.  Analysis

The inquiry under Jackson is whether, "after viewing the evidence in the light most favorable to the prosecution, any

18

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Furthermore, under Jackson, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. This standard is applied with "explicit reference to the substantive elements of the criminal offense as defined by state law." Id. at 324 n.16.

At the time of Brown's 1989 conviction, Louisiana state law defined second-degree murder as, in relevant part:

the killing of a human being:

(1)  When the offender has a specific intent to kill or to inflict great bodily harm . . . .

LA. REV. STAT. ANN. 14:30.1 (West 1987). Furthermore, Louisiana statutory and common law permitted specific intent to kill or inflict great bodily harm to be inferred from the circumstances of the attack and the actions of the defendant. See LA. REV. STAT. ANN. § 15:445 (repealed 1989); State v. Carney, 319 So.2d 400, 402 (La. 1975) ("[T]he numerous stab wounds furnished adequate evidence of the requisite 'specific intent to kill or inflict great bodily harm . . . .'").

In Brown III, the Louisiana Court of Appeal stated that the prosecution had "proved beyond a reasonable doubt that Sheri Lynn

19

Daigle was the victim of a (second degree) murder.  Thus, the question before us is . . . whether or not the evidence was legally sufficient to prove [Brown's] identity as the perpetrator of this crime."  See Brown III, 594 So.2d at 384.  To answer this question, the Court of Appeal recited the "evidence introduced at trial and the various inferences which may reasonably be drawn from that evidence . . . ."  Id. at 385.

We summarize the evidence enumerated by the Court of Appeal, see id. at 385-87, as follows:  Michael Hood reported that Daigle told him that Brown was sexually interested in her, but that she was not interested in Brown.  Kimberly Cagle stated that Brown told her he "needed a woman."  On the evening of May 7, witnesses saw Daigle and Brown together at the 609 Spanish Town Road apartments, at the Prescott Place apartments retrieving the hibachi grill, and driving away from the Prescott Place apartments, but no one saw Daigle alive after she was seen with Brown.  The hibachi was found at the crime scene.  Daigle was seen wearing the same clothes her body was found in.  Daigle's jeans were unzipped and pulled down, but no seminal fluid was detected in a vaginal swab taken from her body.  Daigle's chin was lacerated, which could have been caused either by a blow with a blunt instrument or by placing Daigle's body in the septic tank.  The coroner estimated that Daigle died somewhere between 7 p.m. on May 6 and 1 p.m. on May 7.

20

Elgin Campbell saw a car resembling Brown's coming out of the driveway at 10443 Siegen Lane at about daybreak on May 7. The car had a noisy exhaust system, and Campbell saw that Brown's car had a "bad" exhaust system when he inspected the underside of the car at the police lab. The police expert found that the tires on Brown's car had the same tread design as the cast from the crime scene. The abandoned Siegen Lane house was extremely secluded and set back from the road so as to be barely visible. The area behind the house was overgrown, and the trail to the septic tanks was freshly made and direct. Brown knew the Siegen Lane house and the location of the septic tanks. Brown lied about his knowledge of the Siegen Lane house, and made efforts to conceal this knowledge by calling Laura Cramer. Brown began shaking and his eyes "teared up" when Lt. Keller confronted him with the fact that he had lied about his familiarity with the Siegen Lane house.

The Court of Appeal stated that, from this evidence, a reasonable inference could be drawn that (1) "someone may have had sex or attempted to have sex" with Daigle, id. at 386; (2) the pathway to the septic tanks where Daigle's body was found "had been formed by the individual who had placed the victim's body in the septic tank and that that person had prior knowledge of the location of the septic tanks," id. at 386-87; and (3) that Brown had a guilty mind, see id. at 387. The Court of Appeal concluded that "[v]iewing all of the evidence introduced in this

case, both direct and circumstantial, in the light most favorable to the state, we find that any rational trier of fact could have concluded beyond a reasonable doubt . . . that [Brown] committed the second degree murder of Sheri Lynn Daigle." Id. at 387.

Based on our careful consideration of the Brown III decision and our review of the record, we cannot say that the Court of Appeal's application of the Jackson standard was objectively unreasonable. The Court of Appeal applied this standard with reference to the substantive elements of second-degree murder as defined under Louisiana law. The court considered all of the evidence in the record, as indicated by the facts enumerated in its opinion. Furthermore, since the court also concluded that guilt was proven to the exclusion of all reasonable hypotheses of innocence, it appears that the court assumed, in accordance with Jackson's mandate, that the jury resolved all conflicts in the evidence in favor of the prosecution. Brown has not demonstrated that this application of Jackson is either arbitrary or contrary to Supreme Court precedent. Furthermore, our prior decisions require us to accord great deference to the determination resulting from the Louisiana Court of Appeal's thorough consideration of the evidence. See Callins v. Collins, 998 F.2d 269, 276 (5th Cir. 1993). Consequently, we decline to rule the Court of Appeal's determination that the evidence was sufficient such as to merit issuance of the writ.

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.